1812.

## MORGAN *against* STELL.

Philadelphia,
Wednesday,
December 23.

THIS was an ejectment for a lot of land containing about four acres, in the Northern Liberties of *Philadelphia*, tried before *Brackenridge* J. at a *Nisi Prius* in *November* 1811, when a verdict was found for the defendant.

Upon a motion for a new trial by the plaintiff, his honour now reported the material facts as follows:

On the 12th of *December* 1797, *Turner Camac* and wife, (the real plaintiffs in the cause) then residing in *Ireland*, sent out to this country one *Nicholas Halliday*, under a *joint* and *several* power of attorney to him and *Thomas Law*, to enter upon the lands of the wife in the Northern Liberties, to make leases, receive rents, and the like. The estate was in the immediate vicinity of the city, of great extent and value.

On the 15th of *September* 1799, the power was *recorded* in the county of *Philadelphia;* and Mr. *Law*, not being able, on account of non-residence, to join in the agency, Mr. *Halliday* separately made leases, collected rents, and superintended the estate, *residing* at the same time upon it. Under this power he leased lots to the defendant, not now in dispute.

On the 30th of *November* 1801, Mr. and Mrs. *Camac*, still being in *Ireland*, made a *second* power, to *Nicholas Halliday*, *Thomas Law* and *Benjamin Chew*, or any two of them, *jointly*, *but not severally*, to sell and convey in fee simple, a part of the estate to *Joseph Sims*, to sell and convey to the *United States* another part for a navy yard, and to *lease* the estate generally; but it contained no words expressly revoking the *first* power.

nor was any lease or conveyance ever made under it. *C* resided on the estate as usual, collecting the rents, and making leases as formerly; and on the 9th of *June* 1802, he leased the premises in the ejectment, to the defendant, for ninety-nine years, reserving a fair rent at the time.

*Held* that as between the principals and their attorney *C*, the second power was a revocation of the first; but the defendant being a *bona fide* purchaser without notice, and the principals being guilty of great negligence in taking no steps to give notice of a revocation, when the first power was so notorious, it was not to be considered a revocation as to him, and therefore he was intitled to hold the land.

---

*Marginal note:* A and B his wife, on the 12th of December 1797, by letter of attorney authorised C and D jointly and severally to make leases of a large estate belonging to the wife in the neighbourhood of *Philadelphia*. This power was recorded on the 15th of September 1799, and C acted separately under it, making various leases for 99 years, and receiving the rents. On the 30th of *November* 1801, *A* and *B* executed another power to the same effect to *C*, *D*, and *E*, or any two of them jointly *but not severally*. This power was known to *C* on or before the 5th of *May* 1802; *D* declined acting, and *E* accepted the power merely to prevent *C* from acting alone; but the power was never recorded, nor any public notice given of it,

This *second* power was known to Mr. *Halliday*, probably in the month of *March* 1802, when he wrote to Mr. *Chew* that as the 1st of *April* was approaching, it would be necessary for them to settle the form of their leases. It was certainly shewn to him by Mr. *Chew*, on the 5th of *May* 1802. Mr. *Law* positively refused to act; Mr. *Chew* refused to act in conjunction with *Halliday*, but, as he stated to the jury, he accepted the power for the purpose of preventing *Halliday* from acting alone. No conveyance or lease was made under it, but there was a conference by Mr. *Chew* with commissioners on the part of the *United States*, which proved abortive, and he gave notice to Mr. *Sims* not to pay *Halliday* the purchase money of the land contracted for by him. The power was never *recorded;* it was placed in the recorder's office by Mr. *Chew*, on the 27th of *July*, 1802, and afterwards withdrawn. No notice was given of it in the public papers, or otherwise; and *Halliday* continued to reside on the estate, receiving rents &c. in apparently his former character.

On the 13th of *August*, 1802, Mr. and Mrs. *Camac* executed a *third* power to *David Lenox* and *Benjamin Chew*, expressly revoking all former powers. This power was recorded on the 18th of *November* 1802, and notice of the agency published in the newspapers on the 27th of *January* 1803.

Before the date of the *third* power, *Halliday* on the 9th of *June* 1802, leased the premises in question to *Matthew Feesey* for ninety-nine years, the defendant making the contract as attorney to *Feesey*, and taking possession for him. The rent reserved was a fair one at the time, but owing in part to the exertions of *Stell* in attracting purchasers to that quarter, and in improving this and the adjacent land, it had increased considerably in value. There was no evidence whatever that the *second* power was known to *Stell*, or to any person on the estate. *Halliday* received rent from one tenant to whom he had made a lease on the 2d of *August* 1802.

Mr. and Mrs. *Camac* subsequently came to the *United States*, and an action being instituted by him against *Halliday*, his counsel at the call of *Halliday's* counsel, exhibited on the 24th of *May* 1811, an account headed in the follow-

ing manner. " *Nicholas Halliday* Dr. to *Turner Camac* Es-
"quire, for the following rents which he did or *ought to*
" *have received,* the leases being granted by him *as agent.*"
It contained columns, at the top of which respectively was
written, 1. " Tenant's names," 2. " Leases when granted,"
3. " Payments from the commencement of Leases, *till ter-*
" *mination of agency,*" 4. " Amount of rents." By the 3d
column the rents were charged in every instance up to a
period subsequent to the arrival of the *third* power in the
*United States.* The first column contained the names of *Stell*
and *Feesey,* in several instances, and in one instance. Mr.
*Feesey* was named as a tenant under a lease of the 25th of
*May* 1802. The last lease recognized was under date of the
2d of *August* 1802. But the lease in question was not men-
tioned at all; and at the foot of the account there was a de-
duction of " the rents of *Matthew Feesey* and *James Stell,*
" their leases being now disputed by Mr. *Camac.*"

His Honour, after commenting upon the facts to the jury,
and shewing a considerable leaning to the case made out
by the defendant, told them that it gave rise to the follow-
ing questions:

1. Whether *Halliday* had authority under the *first* power,
in connection with the circumstances attending the second
power, to make the lease in question; or in other words, whe-
ther in the understanding and by the acts of the parties, the
*first* power was any more than conditionally revoked by the
*second,* namely, in case the second should be acted under.
This as a question of fact, he left to the jury.

2. Whether by the exhibit of the 24th of *May* 1811, it
was intended by *Camac* to assert the general authority and
duty of *Halliday* as agent up to the date of the *third* power,
and as ratifying his acts generally to that time, or only in
particular cases.

3. Whether it was the duty of *Camac* to record the *second*
power, and to give public notice of it in the gazette. The
jury, his Honour said, might consider the recording and
publishing as unnecessary; he would reserve that point for
the defendant, who might urge it in bank, if the verdict
should be against him.

1812.

MORGAN
*v.*
STELL.

After thus stating to the Court the facts and points above mentioned, Judge *Brackenridge* proceeded as follows:

In making this report, it will be expected that I should say whether I am satisfied with the verdict, or dissatisfied with it. Were I to say aye or no, it would not convey my ·mind on the subject; for if satisfied, it is *sub modo*, and under circumstances. It cannot but be discovered, that in what I said to the jury on the trial, the inclination of my mind was in favour of such a verdict, and that the impressions communicated had a leaning that way. And it might perhaps be said that there was something like an *astutia* with that view in suggesting the idea of a conditional revocation. And now that the defendant has gotten a verdict, between him and the plaintiff, I might be unwilling to deprive him of it. But why was it that I had this leaning? It was because I thought it a hard action, as it respected the defendant, an innocent purchaser without notice or a pretence of it, even if there had been a revocation. I thought he ought to be protected. But abstracting myself from the hardship of the case as respects him, and excluding all consideration but that of the fact of a revocation, I am not so clear on reflection that I can justify my own impressions, and approve the verdict. If the case was between the plaintiff and his agent for damages, for going on after he had such reason to think that it was the will of his principal, that he should be superseded as to his individual and separate agency, I might think he had due notice, and ought to be answerable. And yet such a verdict on the question of notice, would be inconsistent with that in this case. But whence is it that such embarrassment did arise, and that such dilemma in consequence of it presents itself to the mind? It is owing to the not disposing of the reserved point as a question of law in the first instance. For if the defendant shall be protected by his want of notice of the revocation, actual or constructive, the hardship of paying a valuable consideration and losing the land will be removed, and will not force itself upon the mind in considering the fact of revocation. For it·cannot but be felt as against conscience that he should lose the land and not recover the recompense: and though he might have his action against the agent for undertaking to sell, yet it is more reasonable that he should hold the land, and leave the plaintiff

to his action, who originally gave the trust, and was in default in not having given publicity to his revocation; a publicity at least co-extensive with that originally given of the power, which was not only by recording, but by the gazette. In reserving the point, it was ruled *pro forma* for the plaintiff; that is, the case was to be considered as if the plaintiff was not bound to give such publicity; for it was not pretended that there was evidence of the recording the second power, revoking impliedly the first, nor any advertisement in the gazette.

It being a point of law whether there ought not to have been notice to the public of the revocation, and a question of fact, whether there had been such notice to the public, and there being no evidence of that, I think I ought to have directed a nonsuit. But I suffered the matter to go to the jury on the fact of notice of the revocation to the agent, at the same time telling the defendant, that even if the verdict should be against him, he had a right to move the Court in bank to set aside the verdict, and have a nonsuit entered. If on the argument of the reserved point, which I think ought to come first in order, the Court shall be of opinion that notice, express or constructive, of the revocation to the defendant, is out of the question and was not nece sary, nor ought to have been looked at by the Court or jury in considering the fact of notice of revocation to the agent, there may be ground to set aside the verdict, in order that it may again come forward, disembarrassed with all that feeling derived from that impression. For I will acknowledge that on analysing my impressions on the trial, it seems to me that I felt strongly, and the jury may have done so also, the great force of this; and had a nonsuit been moved for, I was much inclined to have directed it. For though I had not any distinct recollection of any law reading directly on this head, yet in the analogous cases of a dissolution of a partnership in mercantile concerns, the principle would seem to bear, which is a common law principle; and in the case of sales of real estate and personal property will apply. It is against equity that any one should suffer from the default of one who has not given the notice that he might have given of the revocation of authorities which have passed under him. If these ideas are correct, and the law point

1812.

MORGAN
v.
SETLL.

shall be determined against the plaintiff, the setting aside the verdict will be nugatory, for in that case the Court will be bound on setting it aside to order a nonsuit to be entered. The Court will do now what it may have been the duty of the Court at *Nisi Prius* to have done, and what it was in the power of the Judge to have done.

*Hopkinson* and *Rawle* on behalf of the plaintiff, contended, that the verdict was against law and evidence. The first power was revoked by the execution and delivery of the second, because the second was to three or any two of them jointly and *not separately;* of course it negatived the authority of *Halliday* to act alone in the matter referred to in the *second* power. It was inconsistent with the first, and therefore annulled it. This effect was produced from the moment it was *known* to *Halliday*, which was in *March*, or at latest in *May*, and certainly before the execution of the present lease; and hence, unless the defendant's objections to this position are valid, he has no title whatever, and the jury were wrong.

Two objections are taken: 1. That to constitute a revocation, it was necessary that the second power should be accepted; or as it was stated by the Judge, the second power might be considered a conditional revocation only. 2. That it was essential to record, publish in the gazette, or otherwise generally make known, the second power.

1. The second power was in fact accepted. It was accepted by *Halliday* in *March*, when he wrote to Mr. *Chew*, that as the first of *April* was approaching, *they* must settle the form of *their* leases. It was accepted also by Mr. *Chew* to prevent *Halliday* from acting alone. Acts under it were not necessary to make it a revocation. Revocation depended on the intention of the principals, not on the acts of the attornies. Mr. *Chew* however did act, by holding a conference with commissioners of the *United States*, and by giving notice to *Sims*. His authority to do either of these depended wholly upon the second power, and of course he acted under that power.

2. It lies on the defendant to show the necessity of recording and publishing the second power. No act of assembly requires the former; and independent of statutory regulation,

1812.

MORGAN
v.
STELE.

it is not necessary to record any instrument. Recording would be useless, because not being required, it would not amount to notice. Publication in the gazette is not prescribed by statute, and is alike unnecessary. In what paper should it have been published, and how many times? Unless actually brought to the knowledge of the defendant, such publication would amount to nothing. To whom then should private and personal notice have been given? Here lies the fallacy of the objection. It requires notice to the defendant, when all the world were as much intitled to it as he. Who was to give notice to all the world? No one. Where no one is bound to give notice, the defendant ought to take notice at his peril. 16 *Vin.* 11. *c.* 2. But it is not notice to the purchaser, that constitutes a revocation; notice to the attorney is sufficient. Our act of 1705, 1 *Smith's Laws* 69, is explicit. " No sale of lands made by virtue of a power of attorney, " shall be good and effectual, unless made while such power " is *in force;* and all such powers shall be accounted deemed " and taken to be in force, until the *attorney* or agent shall " have *due notice* of a countermand, *revocation,* or death of " the constituent." He who deals with an attorney, trusts to the attorney. If the attorney has received notice, it not only terminates the power, but it is notice of the termination to him who derives through the attorney. The defendant must look to the person who has defrauded him, not to the principal, who gave to the attorney due notice of a countermand. A contrary doctrine compels the principal to follow the steps of his discarded agent forever, for the purpose of interposing notice to all whom he may attempt to defraud. The account exhibited by *Camac* makes not the least impression on this cause. It was exhibited in another suit, and between other parties. It was a mere charge against *Halliday,* prepared and offered by counsel, and is analogous to a bill in Chancery, which is not evidence against the complainant in another suit. Besides, *Camac* had a perfect right to affirm some leases, and to disaffirm others. In this exhibit he expressly excepts all leases to *Stell* and *Feesey,* and does not even state the existence of the present lease.

*Binney* and *Wallace* contended for the defendant, 1. That upon principles of equity, the Court ought to refuse a new trial. 2. That at law the defendant had a title.

1. The defendant is a *bona fide* purchaser, for a valuable consideration, without notice. Not a fact appeared to the contrary at the trial, and the jury have settled it by their verdict. His exertions redeemed the property from a waste, and improved the estate of *Camac* in its neighbourhood; and he has strong equity in this circumstance, especially as the rise in value is the only motive for the suit. This Court are now in the situation of a court of equity that is asked to lend its powers to a plaintiff to overcome the title of such a defendant; for a new trial is wholly in their discretion. They may, and they ought to refuse their assistance. A court of equity will not take the least step against such a purchaser. If there is a shadow of blame in the plaintiff, they will not do it; *à fortiori*, where by his gross negligence, his confidence in his own agent, his continuing him in the agency generally, he produced the whole mischief. *Camac* indirectly encouraged the defendant to purchase, and if it were necessary, might be compelled to confirm the title. He originally gave credit to *Halliday*, and reposed confidence in him. He alone could prevent *Halliday* from abusing the trust. He invited others to confide in him, and took no step to inform them when that confidence ought to cease. A court acting with equity powers, or to whose discretion such a party applies for aid, should leave him with the jury. 2 *Salk.* 644., 2 *Cas. in Chan.* 108. 156., 1 *Vern.* 156., 2 *Vern.* 599.

2. But the defendant has a title at law, for several reasons. The first power was not revoked by the second, even as to *Halliday*. The second power contains no words of revocation; if it has the effect of revoking, it must be from the intention and acts of all the parties as they appeared in evidence. But from these the contrary followed. Mr. and Mrs. *Camac* did not intend to be without an agent in *America;* they therefore meant that, if the first power ceased, it should cease in consequence of the creation of another agency to supply its place; and if that other agency did not take effect, the old one was to continue. Their confidence in *Halliday* was not gone, or they would not have connected him with *Chew* and *Law.* Did the second agency take effect? It can-

not be pretended. Two must have agreed to act, or it was of no effect. *Law* declined. *Chew* would not act with *Halliday*. Then *Halliday* alone was left. It is said *Chew* accepted to prevent *Halliday* from acting alone; but it was a novel idea to accept a power with a determination not to act under it. *Camac* did not consider the second power as a revocation, as is shown by his account that charges *Halliday* as agent up to the third power. *Chew* did not consider it so, or after putting the second power into the office for registry, he would not have withdrawn it. *Halliday* did not consider it so, or it is to be presumed he would not have acted alone. There is then the intention of the principal, his subsequent declaration, and the opinion of both attornies, that it was not a revocation; and the instrument says nothing to the contrary.

But it was not revoked as to the defendant. The circumstances are to be considered. The estate was a very extensive one; the agency notorious; the power of the agent recorded; his residence on the land. Such an authority is not revoked by mere notice to the agent. The rule of law is that every one is bound to take notice, where no one is bound to give notice; but where there are public evidences of authority, a recorded power, residence on the estate, possession of title papers, the principal is bound to give notice. Where one has been so long the agent of another as to become generally known as such, the principal must make the revocation as notorious as the power, or the acts of the agent will bind him. It is so as to partners in trade, who are the agents of each other. *Peake's N. P.* 42. 154. It is so generally by the civil law. *Pothier on Obligations* 80. *Liv.* 12. *s.* 2. *and Liv.* 32. *ff. de solut.* In the case of domestic servants. *Bolton* v. *Hillersden* (a). And also in the case of agents appointed for commercial purposes, such as drawing bills, and the like. In ——— v. *Harrison* (a), a servant had power to draw bills in his master's name, and afterwards was turned out of the service. If he draw a bill, said Lord Chief Justice *Holt*, in so little time after, that the world cannot take notice of his being out of service, or if he were a long time out of his service, but that kept so secret that the world cannot take notice of it, the bill in those cases shall bind the master. Here the second power was kept secret. Where a thing lies

1812.

MORGAN
v.
STELL.

_____

(a) 1 *Ld. Ray.* 224., 3 *Salk.* 234. *S. C.*      (b) 12 *Mod.* 346.

more properly in the conusance of the plaintiff than the defendant, notice is necessary. 16 *Vin.* 5. *pl.* 12. *pl.* 19. 16. 18. 9. 2. 4., *Pothier* 302. *No.* 448., 47. *No.* 79. 81. Certainly the power of attorney might have been recorded. It was a deed relating to lands. So it might have been published in the gazette, it might have been made known to the tenants on the land, of whom the defendant was one. If notice was necessary in any way, the plaintiff fails, because it was not given at all. The act of 1705, which respects notice to the agent, does not apply. That act by the preamble was intended to secure purchasers, not to say when they should be defeated. It appears to have been made under a belief that a countermand, or death, without notice, might revoke a power of attorney; and was intended to quiet this apprehension only.

TILGHMAN C. J. after stating the facts, delivered his opinion as follows:

It is contended on the part of the plaintiff, that the second power, differing essentially from the first, operated as an implied revocation from the moment that *Halliday* received notice of it, and that consequently the lease under which the defendant claims, was made without authority. On the other hand, the defendant urges, that being a purchaser for valuable consideration without notice of the revocation of the first power, the plaintiff ought not to recover against him. There is no doubt but that as between the principal and his attorney, the first power was revoked as soon as notice was received of the second. From that moment *Halliday* ought to have ceased to act, and any person injured by his acting may support an action against him. But it is not so clear that the first power is completely extinguished as to third persons, who have no means of knowing of the revocation of it. I do not find any express decision on this subject with regard to powers of attorney which operate upon land. As to agents, whose power extends to personal effects, we have authorities founded in strong reason. It is said by Lord Chief Justice *Holt* in 12 *Mod.* 346, that if a merchant authorises his servant to draw bills in his name, and then dismisses him from his service, and the servant draws a bill in so short a time that the world cannot receive

notice of his dismissal, or if the dismissal is kept secret, and the servant draws a bill a considerable time after, the master is bound. So it seems to be agreed, that if partners in trade dissolve their partnership, those who deal with either partner without notice of the dissolution, have a right of action against both. The law was so laid down by Lord *Mansfield* in *Fox and others* v. *Hanbury. Watson on Part.* 201. It seems unjust that when one has authorised another to act for him by a writing, which is left in possession of the agent, third persons should be affected by a revocation of which they have no possibility of notice. The civil law requires notice, as appears by *Pothier on Obligations,* No. 79, 80, 81. and 448. But it is said that *land* differs from *personal effects;* that the title of land is transferred with more solemnity, and the purchaser is to look to the writings, and seeing from them that the person with whom he deals does not pretend to any thing more than an authority to act for another, he trusts to the good faith of the agent, against whom he has his remedy, if he is deceived by him. It is asked too, to whom and in what manner the principal is to give notice? As to the persons to whom, and the manner in which notice is to be given, the difficulty is no greater with regard to land, than to personal property. A court and jury may judge of the reasonableness of the notice in the one case as well as the other. As to the confidence which the purchaser puts in the agent, it is to be remarked that the principal puts confidence in him likewise, and puts in him the *original confidence,* which gives the opportunity of deceiving others. No act is omitted by the purchaser which prudence or justice could require; he is guilty of no negligence; he conceals nothing by which his neighbour may be injured. Not so the principal. His revocation is known to himself, and he cannot but be conscious that unless made known to others, they may be subject to great injury. But independent of general principles, the plaintiff relies on an act of assembly made in the year 1705, by the fourth section of which it is enacted, that no sale of lands made by virtue of a power of attorney shall be good, unless made while such power is in force, " and all such powers shall be accounted, deemed " and taken to be in full force, until the attorney or agent " shall have due notice of a countermand, revocation, or " death of the constituent." It appears by the title of this

act, that one of its principal objects, *was the confirming sales of lands made by attornies or agents.* The legislature were probably not learned in the law, because it seems to have been a doubt whether acts done by the attorney after the death of the principal, or revocation of the power, and before notice, was good. The act very properly removes all doubt on that subject; but it cannot be supposed that it was intended to lessen any obligations, which by the general principles of law or equity, were imposed on the constituents for the benefit of innocent purchasers. I do not think it necessary on the present occasion to lay it down as a rule, that in no case is the revocation of a power of attorney effectual, without notice. It is enough to say, that where there has been great negligence, innocent purchasers should be protected. There were particular circumstances which called for notice in the present case. The property was large and adjoining a populous city, so that many persons might be expected to take leases. *Halliday* resided on the estate, and we must suppose that this was known to his constituents. Having resided there and acted as agent several years, he was continued as an attorney in the second power, which gave him a pretence for remaining in the same habitation, and justified the world in supposing that his original authority was undiminished. The first power was on record, the second remained unrecorded, and unknown, for several months after it was in possession of the persons appointed to act with *Halliday.* Here is a combination of circumstances, tending to put the public off their guard, and, taken altogether, they appear to me to amount to that kind of negligence, which intitles the purchaser to the protection of the law. There is no imputation on the integrity of Mr. *Camac,* or any of his attornies except *Halliday,* who certainly acted dishonestly in making leases after notice of the second power. The misfortune is, that too much reliance was placed on him. It was taken for granted that he would cease to act alone. Somebody must suffer by him; and under all the circumstances of the case, I am of opinion that the loss should fall on his constituents. I am therefore against a new trial.

YEATES J. The defendant contends that he holds the lands in question under a legal right. He insists that at all

events, such equitable circumstances exist in his case, as
would restrict the Court in the exercise of their discretion
from awarding a new trial.

The defendant claims under a lease for ninety-nine years
dated the 9th of *June* 1802, from *Nicholas Halliday*, esquire,
as attorney in fact of *Turner Camac*, esquire, and *Sarah* his
wife, to *Stell* as attorney in fact of *Matthew Feesey*, under
the yearly rent of five dollars per acre. The letter of attor-
ney to *Halliday* was duly acknowledged before the Lord
Mayor of *Dublin*, and recorded in *Philadelphia* county on
the 15th of *September* 1799. The title to the lands antece-
dently to the lease, is admitted to have been in Mr. *Camac*,
and the plaintiff contends that the first letter of attorney was
revoked by a subsequent one, dated the 30th of *November*
1801, constituting the said *Nicholas Halliday*, *Thomas Law*,
and *Benjamin Chew*, junior, their attornies, and empowering
them or any two of them to lease this property. The second
power was exhibited to *Halliday* by Mr. *Chew* on the 5th
of *May* 1802, but was neither recorded, nor advertised, nor
generally known. There was no express revocation in it of
the first power; but it was so far inconsistent therewith, that
it restrained the power to lease to *two* of the agents. Mr.
*Law* never acted. It was urged, that this second power
upon common law principles countermanded the authority
under the first power, and that the act of assembly of 1705,
1 *Dall. St. Laws* 73, removed all doubt on this subject. It
is declared by the fourth section thereof, " that all sales of
" lands shall be accounted, deemed and taken to be in force,
" until the attorney or agent shall have *due notice* of a coun-
" termand, revocation or death of the constituent;" and
hence it was inferred, that notice to the attorney *ipso facto*
of either of these events, determines his authority to all legal
purposes. To this it is answered with much strength of
argument, that the consequence is not necessarily drawn
from this old law. The professed object of the legislature
was to render the purchasers of lands from the agents of
foreign owners more secure in their titles, but not to specify
the instances wherein their titles would be defective. The
foreign owner confides in the fidelity of his agent here; and
if the latter abuses his trust, it is more equitable and reason-
able that the constituent should suffer thereby, than inno-

cent persons, wholly without the means of information as to the validity of the powers delegated. If the first power be recorded, let him procure the countermand or revocation to be recorded also, or let him give it publicity on or near the lands. By adopting the principle insisted on by the plaintiff's counsel, palpable injustice would be often done. Take the case of an attorney in fact duly authorised to collect debts, and suppose his power to be countermanded by some secret act of his principal, or of his death, made known to himself, but unknown in this country,—shall the payment of a debt to such attorney be thereby invalidated? On whom should the loss fall, if the attorney should become insolvent?

A case occurred in this Court a few years after I had commenced the study of the law, involving principles similar to those which form the subject of our present inquiry, and made a strong impression on my mind. It is briefly reported in 1 *Dall.* 9, and was in substance thus. *Benjamin Albertson,* claiming certain lands by descent in *Bucks* county, brought an ejectment against *Septimus Robeson* for their recovery. The title of the lands was clearly shewn to have been at one time in the ancestor of the lessor of the plaintiff; but at a subsequent period the lands were decreed to the defendant, by this Court, in pursuance of certain chancery powers, delegated to them by an old act of assembly. The royal assent was refused to this law in *England;* and it so happened, that the repeal *preceded* the decree of this Court above two months, but the repeal was not known here when the decree was made. The Court determined upon full argument, that the unknown repeal could not affect the right of the defendant under the decree, and the jury found accordingly. I well recollect, that the decision gave general satisfaction to the profession.

I know no precise rule which can safely be laid down in cases of this nature. Every case must be decided on its own peculiar circumstances; though great hardships may arise on either side of the question. I do not hold it indispensably necessary, that the countermand or revocation should be recorded in order to obtain that legal effect; but it is highly prudential so to do, where the original power has been entered of record. I think I am safe when I assert, that where the countermand, revocation or death of the constituent, is

not generally known, nor can be traced to the knowledge of the fair lessee or purchaser, and where they cannot justly be charged with laches or negligence as to receiving information of either of those events, they ought to be protected upon every principle of sound legal policy.

In the case before us, *Halliday* was the known agent of Mr. and Mrs. *Camac*, under their letter of attorney of 1797, duly recorded, living in their mansion house on the premises, and in the actual exercise of powers legally delegated to him. Mr. *Chew* was co-agent with him under a new letter of attorney dated in 1801, but no publicity whatever was given to it, nor was it recorded. Carelessness or inattention cannot be ascribed to the defendant under these circumstances. The account of Mr. *Camac* against *Halliday* furnished in *May* 1811, ratifying his acts done in certain instances after the 5th of *May* 1802, and charging the termination of *Halliday's* agency in *October* and *November* following, are strong additional circumstances in favour of the defendant's possession.

Upon the whole I am of opinion that the motion for a new trial should be denied, as well on equitable as legal principles.

BRACKENRIDGE J. I have expressed my ideas on this case in my report to the Court, with the notes of the evidence. I said on the trial, that should there be a verdict for the plaintiff, yet if, in arguing the reserved point, it should appear that he was not entitled to retain it, it should be set aside, and a nonsuit entered. This seemed to strike the counsel, or some of them, as what could not be done, as the plaintiff may in all cases refuse a nonsuit, and elect to take a verdict.

The verdict in this case is for the defendant, and it is the same thing to him that a new trial should be denied. But for the reasons given in my report to the Court, I should like the course better to set aside the verdict, and direct a nonsuit to be entered. And with a view to shew the power of the Court to take this course, I shall take the liberty of making a few observations.

The question comes to this. Can a plaintiff in all cases refuse to be nonsuited, and say to the Court, charge the jury,

1812.

MORGAN
v.
STELL.

I will answer and take a verdict? · Can the Court in no such case say, let the jury be discharged, and a nonsuit be entered?

It is admitted, that where there is evidence material to the issue, and where the conclusion of fact must be drawn by the jury, before a question of law can arise on that conclusion, the Court cannot direct a nonsuit. But where there is no evidence at all given, or where there is none to a fact, without which being found the action cannot be maintained, has not the Court a right to direct a nonsuit? The plaintiff, it will be said, must be called in all cases; and does not this imply that he has a right to answer and defeat the nonsuit? But what is this answering? Is it not to prosecute his suit by giving evidence? Is it not in this way only, that he can be considered, as in contemplation of law, *answering?* Would not his answering orally, and under the old law, with a view to defeat an *amercement,* claiming a verdict, be a contempt? The cases in which nonsuits are usually ordered, are where there is no evidence material to the issue, or to what is necessary to maintain the action; and without the proof of which, whatever else may be proved, the verdict must be for the defendant, or be set aside by the Court. To what purpose charge the jury, if, on matter of law, not arising from the conclusion of matter of fact to be drawn by them, it clearly appears to the judge, that the verdict, if not for the defendant, must be set aside? These cases are where, on the evidence disclosed, the Court will appear not to have jurisdiction, where the plaintiff has mistaken his process, cases of variance between the writ and declaration, the declaration and the evidence, or the nature of the action, *turpis contractus, malum prohibitum, malum in se, contra bonos mores, nudum pactum,* and the like; or where something was necessary to be done, or offered to be done, in order to entitle to bring the action; or where the *requisitus* is not merely matter of form, but notice, and demand must precede; notice at common law in the nature of the case, or notice under statute, compliance with a condition precedent in a covenant, cession or abandonment in an insurance case. In all or any of these cases, no evidence appearing, shall the judge be bound to carry the matter further, and not say he will nonsuit the plaintiff?

Shall he be bound to hear the matter of law argued to the jury, and to charge them on it, or not at once to take it from them, and *nolente volente* the plaintiff, discharge the jury, and direct a nonsuit to be entered? This at least is fit in the modern understanding of the *English* courts. In the language of the present Chief Justice of the Court of King's Bench, " when it is clear the action will not lie, the " judges are in the habit of directing a nonsuit, even though " the objection appears on the record, and might be taken " advantage of on a motion in arrest of judgment." Does not the right which the defendant has, and exercises, to move for a nonsuit *ex adverso* to the plaintiff, imply that the Court have the power to order it? And this is done, either where there is no evidence to support the issue, or where there is no evidence to support a fact material to it, or without establishing which, in the first instance, there can be no recovery, whether it be from the person of the defendant, the mistake of action, incongruence of proof, nature of the demand, or any other of that infinity of grounds which will go to defeat it for the present time, or altogether. An action may be brought too soon or too late, and these are clear grounds of nonsuit. In innumerable cases the verdict is taken for the plaintiff, subject to a point reserved, to be set aside if for the defendant, and a nonsuit entered. Does it not imply the power of the Court to decide on the point of law, and direct a nonsuit? For if it must depend upon the will of the plaintiff to take or avoid the nonsuit, how could this be done? The calling of the plaintiff was with a view to an amercement, which was originally matter of substance, but is now nothing more than matter of form; and the calling is but the mode of directing the nonsuit. Looking over the reports at *Nisi Prius* in the *English* courts, it will be seen that the greater number of cases go off upon nonsuits on legal grounds; and the calling of the plaintiff never supposes that he has a right to resist a nonsuit, by insisting on an argument on the law point before the jury. Hence one cause of the rapidity with which trials are despatched in those courts. Whatever may have been the understanding or principle at an early period, Courts are now considered by the modern practice, as possessing an authority, paramount to any consent by the plaintiff, to order a nonsuit

1812.

MORGAN

*v.*

STELL,

under the circumstances, and to the extent above laid down. I know that in all cases it may be said, that in strictness the Court do not order a nonsuit. But they overrule the evidence, or rule the point of law, so that the plaintiff cannot go on with the least hope of success with the jury; and this is no more than indirectly producing a nonsuit.

But I say they can directly say, call the plaintiff; and whether he answer or not, unless he fills up the gap, or shews an action that he can maintain, will nonsuit. He has been called, but answers to no purpose. The jury shall not be charged, but discharged. The calling him is but the mode of entering the nonsuit, which still remains when the reason of the form has ceased; and the plaintiff when called, is no more expected to answer, than the audience are, when the preacher calls from the pulpit, and puts a question which is but introductory to his own conclusion that he means to draw. I mean in a case where it is understood that he is called but *pro forma*, and a nonsuit having been ordered is about to be entered, where there is no evidence of fact to go to the jury, but a point of law is all that is to be considered. This doctrine does not intrench upon that of the jury having a right to judge of the law as well as of the fact in the first instance, when it is submitted to them under the direction of the Court, being involved in the general issue, and cannot in the first instance be separated from it; in which case the Court can interfere only by granting a new trial.

If the plaintiff is called, it is under the idea that he has not followed up his claim with his attendant witnesses. *Sectam non produxit;* and answering, not to produce more, but to escape amercement, is treating the Court with ridicule, and saying I have followed up and produced suit, notwithstanding your notions of the matter; charge the jury, I will take my chance with them on the law which you consider against me. This has nothing to do with the plaintiff being called to take a verdict; his answering in that case is not matter of form, but substance; for his assent to take it, is essential. A thing cannot be given, where there is not an assent to take; and it is an understanding, when the jury are sworn to give a verdict, that the party will be in court, and willing to take it. The not *taking*, as in every other case,

dispenses with the giving. Looking at the *American* reports, I find this point to have been directly before the constitutional Court of Appeals in *South Carolina*, in the great case of *Brown* v. *Frost*, 2 *Bay.* 133. It was on a motion for a new trial, because the Judge, at *Nisi Prius*, did not direct a nonsuit. A nonsuit had been moved for on the trial, on the ground of there being no evidence to connect the plaintiff's title with him in whom the estate was admitted to have been, but the recital of a deed from him in a conveyance made to the plaintiff. It was the case of a lost deed. It was objected that the Judge had not the power *ex adverso, nolente volente* the plaintiff, to order a nonsuit. The Court lay it down that he had power, but that the recital was evidence to go to the jury. It came also before the Court in *Hopkins* v. *De Graffenreid*, 2. *Bay.* 187. The defendant called for a nonsuit, the plaintiff opposing, and contending that the case should go to the jury. *Bay*, Justice, refused to suffer a case to go to the jury, where there was nothing to support the plaintiff's right. It would be a nugatory act. The Court above sustained his right to order a nonsuit, but thought there was evidence to go to the jury. In *Massey* v. *Trantham*, 2 *Bay.* 421, we have precisely the course taken, which I have in this case pointed out. The Court were of opinion, that the judge in the Court below, shoul dhave directed a nonsuit, and in that case did not go into a consideration of the motion for a new trial. On the power of the Court to order a nonsuit, I will add, 2 *Bay.* 437. It was a motion to set aside a nonsuit, on the ground of its having been irregularly ordered, and the rule was discharged by the Court above as having been regularly ordered. But looking farther on in that book, 441, I find the language that comes precisely up to my idea of the power of the Court, in regard to ordering a nonsuit. Nonsuit ordered by the presiding judge, without the consent of the plaintiff in the action, who was willing to risk his case with the jury. It was objected that when a jury is once sworn upon a cause, and charged with the evidence, the judge cannot discharge them; that if the plaintiff thought proper to risk his cause to a jury upon such evidence as he could procure, or such as he thought would bear him out in his case, a judge cannot step in between him and the jury, and prevent them from giving a verdict; nor can a judge order a plaintiff to

be nonsuit against his will and consent, so as to deprive him by such order, of the benefit of the inestimable trial by a jury of the country. To which it is answered, that it is the province of the judge to determine the law; and no legal evidence being offered to support the suit, it is his duty to direct a nonsuit; for it would be nugatory to send a case to a jury, where there was no legal evidence to support it; and whatever the old practice might have been in *England*, of the judges not ordering a nonsuit without consent of the plaintiff, when they discovered a defect of evidence, it was neither founded in good sense, nor sound reason, and modern adjudications have determined otherwise. In this country, it is invariably the practice for the judges in all cases to exercise that discretionary power, which the law has vested in them, whenever they have discovered a defect of evidence to support the plaintiff's claim. Such was the argument of counsel in this case.—And by the Court, in this case on a trial before a jury, wherein it appears that the evidence is insufficient to make out the plaintiff's case, or where there is a total failure of proof necessary for that purpose, it is the duty of a judge to enter a nonsuit, whether the plaintiff consent or not; because there can be nothing to send to a jury to found their verdict upon, and consequently any verdict they would give, would be a nugatory act. I know a distinction has been taken in the books between the ordering a nonsuit, where a point has been reserved, and where it has not; and it is on that ground, that it has been said by some judges, " that it is impossible to order a nonsuit to be en- " tered, unless by consent, after the plaintiff had appeared, " and a verdict has been taken." But there is no reason for the distinction, and it has given way to a better and more modern practice. For what is it whether he has answered, and a verdict given, if on ground of law he must be thrown out of court ultimately in the action, wanting law or fact established to support the proceeding? But here the point was reserved, and if the objection has any thing in it, does not lie.

I could go through the courts of the union, and shew that this is the understanding of the law; but I content myself with referring to the *New York* Reports, 8 *Johns.* 25, where on a motion for a nonsuit, the judge ruled " that the evidence

" was insufficient to sustain the action, and nonsuited the " plaintiffs," on which a bill of exceptions was tendered, but affirmed in bank; for by the Court, " if the cause had gone to " the jury, the testimony would not have warranted a ver-" dict for the plaintiffs, and the motion to set aside the non-" suit, ought to be denied." Why should I labour a thing so plain, when the cases are numerous, where a verdict taken for a defendant on a point of law which the judge rules in his favour, will be set aside, and where no damages are to be liquidated, will be ordered to be entered up for the plaintiff. This proves that where a verdict is taken, or to be taken, or depends upon an *abstract* point of law, it is at the absolute disposal of the Court, without consulting the plaintiff or defendant in the case.

New trial refused.