## DALZELL *v.* CRAWFORD. ·

Where a recovery in damages would not be an adequate remedy for the assertion of the plaintiff's rights under a contract for the sale of land, the courts having equity powers in this state will entertain jurisdiction of the cause.

The specific execution of a real contract in equity is not of absolute right in the party asking it, but of sound discretion in the Court.

Although the subject and import of the written contract are clear, so that there is no necessity to resort to evidence for its construction, yet if the defendant can show any circumstances, *dehors,* independent of the writing, making it inequitable to interpose for the purpose of a specific performance, a Court of Equity having satisfactory information on the subject will not interpose.

A marketable title in equity is one in which there is no doubt involved either as to matter of law, or fact; and such a title only will a purchaser be compelled to accept.

The absence of a description of the property in an *alias levari facias* on a mortgage, constitutes no objection to the title of a purchaser under such writ, where it can be amended, and the description supplied from the *sci. fa.* and the original *lev. fa.*

The rule in equity is, that no title will be forced on a purchaser which is not so free from difficulty as to law and fact, that on a resale, an unwilling purchaser shall be unable to raise any question which may appear to a judge sitting in equity, so doubtful that a title involving it ought not to be enforced.

Wherever the trust or charge on land is of a defined and limited nature, the purchaser must himself see. that the purchase-money is applied to the proper discharge of the trust; but whenever the trust is of a general and unlimited nature, he need not see to it.

So also where the trusts are defined, and yet the money is not merely to be paid over to third persons, but is to be applied by the trustees to certain purposes, which require on their part, time, deliberation, and discretion, it seems the purchaser is not bound to see to the due application of the purchase-money.

Where a purchaser has refused from other reasons than the existence of encumbrances to complete his purchase, the seller can recover damages for the purchaser's breach of contract, if he be able to satisfy the jury that the encumbrances were of such a nature that he could and would have removed them, had the purchaser been willing to accept a conveyance.

Courts of Equity will not refuse their aid to a vendor, who asks a specific execution of a contract for the sale of land, on the ground of doubts in relation to the title, except where the doubts are "*considerable*" and "*rational,*" and where, though the Court may on the whole consider the title good, they yet see real and serious difficulties in relation to it; and the opinion of conveyancers or of counsel against a title will not justify a party in refusing to comply with his contract.

*Nov.* 10. THE facts of this cause are so fully stated in the opinion of the Court, that it is deemed useless to furnish a more extended synopsis of them.

The cause was argued by Messrs. *Peter M'Call* and *F. W. Hubbell* for the plaintiff, *John Sergeant* and *W. B. Reed* for the defendant.

It was contended by Mr. *Reed,* for the defendant, who argued the case on exceptions to the report of the master, that this was a

D

case of unequal bargaining. Crawford was a clergyman and school-master, and not expert in contracts. Dalzell was an expert, familiar with bargains, and the subject connected with sales. That the title was doubtful, and was not marketable; that it was not free from doubt and exception, as it must be to render it marketable: 20 Law Lib. 11–12, No. 28. Here it was defective. A married woman had no authority in Pennsylvania to bar her dower, or sell property by attorney. A fine could not so be levied: 3 Taunt. 260.

In Pennsylvania the English doctrine prevails, that time is not of the essence of a contract, unless made so in express terms: Atk. 161; 3 Meriv. 84; 1 John. 306; 2 Sch. & Lef. 603; 2 Jacob & Walker, 285, 289; 5 Cranch, 276. Circumstances may make time of the essence of the contract: 1 Wheat. 196; 6 Ib. 528; 1 Russ. 376; 6 Call, 308; 1 Simons & Stewart, 190; 2 Story Eq. 750.

Mr. *Hubbell,* for plaintiff.—This is an unwilling purchaser, who almost at once abandons his contract. He does not even call on the seller to amend defects, but at once repudiates it, and gives the vendor no time for explanation, or to hunt up the lost record, which was at first the sole objection to the contract. The question is, whether this is a marketable title. Both of the alleged defects are curable. As to the alleged defective acknowledgment to constitute an attorney, the Court can require such defects to be cured in the terms of the decree: 2 Whart. 453. The title is good without amendment: 3 Watts, 87. The case in 8 S. & R. settles the question of the right of the wife to create an attorney.

On contract expressing no time for its immediate execution, even at law, the party has no relief. In general, where no time is mentioned in the contract for its completion, the party has up to the time of making the decree to complete his contract: Sugden on Vendors, 419, 491, 503, Chap. 8.

When the time is mentioned, and forms the material part of it, then it must be assumed.

The chancery powers conferred upon this Court are sufficient to give specific relief when a recovery in damages would be an inadequate remedy: Purdon, 238.

Mr. *M'Call,* on the same side.—A party cannot take exceptions in Court on the argument which were not taken before the master in relation to the defect of title. The point should be made before the master: 4 Madd. 212. The point as to the want of capacity of a married woman to create an attorney was not then made.

It is not the rule in equity that a purchaser need not take a title objected to by a conveyancer. The rule is this, that a purchaser shall not be compelled to take a title, when he fairly may be involved in litigation : 1 Vesey, Jr. 565 ; 12 Vesey, 252 ; 16 Ib. 272 ; 4 Russ. 374 ; 6 Madd. 159 ; Newl. on Contr. 237 ; Sugden, 420. A purchaser will not be permitted to object on the ground of a bare possibility of defect : 11 Vesey, 465.

The term merchantable title is an innovation on the law, and a departure from the ancient doctrine. This Court ought to look at the kind of doubts equity has regarded, and they will all be found to be those, where it is serious and substantial, and such only as may endanger its validity ; not captious, frivolous, or evasive exceptions, which should not be noticed : 2 P. Wms. 198 ; 1 Brown Ch. Rep. 75 ; 1 Vesey, Jr. 565 ; 16 Vesey, 272 ; 1 Gilbert, 241.

The title is good ; the defects are, and can all be removed, and the title made perfect. We have the return of the sheriff, and acknowledgment according to law : 1 S. & R. 93 ; 10 Peters ; Vohrees *v.* Bank of U. S., 1 Baldwin, 272 ; 8 S. & R. 268 ; 2 Wharton, 490 ; 9 S. & R. 277 ; 3 Watts, 87. The acknowledgment of a letter of attorney for the conveyance of land under the Act of Assembly, is good. The letter of attorney is a deed for that purpose : Act of 16th April, 1840. It is an assurance of land : 2 Black, 295, Act 1770, and Act of 1705, all show that such a letter of attorney is a deed, and within the provisions of the law : 8 S. & R. 299 ; 1 Pet. C. C. Rep. 430 ; Morgan *v.* Grath, 5 Cranch ; 5 Bing. 305.

But if it is defective, we may now correct it before decree : 7 Vesey, 202 ; 14 Ib. 205 ; 6 Mod. 256 ; 1 Jacob & Walker, 644 ; 16 Vesey, 156 ; Sugden, 32, 34, 40 ; 2 Brockenbrough, 234 ; 3 Swanston, 699 ; 2 Dessau. 375.

Is time essential in this contract ? If time is material here, it must be in every contract, and in all cases brought in Court. Time may be material in law ; but not generally in equity, because substantial justice is the great end of equity. The ancient doctrine of English equity was, that *time* was never essential. But this has been modified, by holding that the parties may make time material ; but when they have not done so, it remains unessential : Gilman *v.* Patterson, 1 Atkin. 112 ; 4 Brown C. C. 329 ; Seaton *v.* Slade, 7 Vesey, 265 ; 4 Brown, 469 ; 4 Vesey, 686 ; 5 Ib. 718, 818 ; 7 Ib. 209 ; 12 Ib. 315 ; 3 Merivale, 81 ; 6 Madd. 24 ; 1 Eng. Cond. Ch. Rep. 302 ; 1 Simons & Stewart, 590 ; 8 Paige, 600 ; 1 Jacob & Walker, 419 ; 14 Com. Law Rep. 225 ; 4 Cond. Chan. Rep. 293.

The title was to be indisputable.   What is the title equity requires a man to take ?   Specific performance is compelled or refused according to legal doctrine.   A doubtful title will induce equity to refuse all interference, because the party still has his remedy at law : 4 Russ. 374 ; 3 Cond. Ch. Rep. 713 ; 3 Vesey, 565, 7 ; 3 Brockenbrough, 244 ; 16 Vesey, 272.

This Court has jurisdiction.   This objection has come too late. It was matter of demurrer on the face of the bill, or should have been raised by plea : 2 Daniel's Ch. Pr. 34.   The Court has general jurisdiction, and the defendant has submitted himself to it ; he now comes too late with his objection.   But the Act of 1836 gives to this Court jurisdiction : the legislature intended to embrace this kind of cases in which equity gives relief : 2 Story, 35.   The Court have it on the ground of inadequacy of common-law relief : 10 Mod. 503 ; 1 Sim. & Stew. 174 ; 1 Eng. Com. Law, 36 ; 1 Cond. Reps. 314 ; 1 W. & S. 245.   The party here has a right to the specific performance of the contract ; a right which a Court of law cannot give him.

Mr. *J. Sergeant*, in reply.—The title was inadequate to pass the land—it was defective.   The acknowledgment was defective.   There was an encumbrance against the transfer until some time after suit brought.

It is evident from the face of the Act of 1836, that there was no intention to make this a Court of Chancery generally, for that is given to a single man.   No one can ask relief, unless he could not have recovered damages at law.   Such is the true reading of the Act.   An inadequate remedy at law alone gives jurisdiction to the Court : 5 Whart. 466 ; 6 Whart. 522 ; 11 S. & R. 277.

*Time* was material.   Contracts for the sale of dwelling-houses are always considered those in which *time* is of the essence of the contract.   Where it is material, the party seeking to enforce the contract must show himself ready at the time to comply : 2 Brockenbrough, 212.   In most cases the party has done something to waive the benefit of time during the negotiation.   Here, Crawford, from the outset, insisted on the benefit of time, claimed the right of having the dwelling as his home, and it is evident that time in this case is material.   But the title was defective, and that embarrassment was not removed.   The evidence is clear that learned counsel had condemned the title, and the party was not bound to take it. The vendor should have been ready with a good title at the time. He was not, and the Court will not now compel him to accept a conveyance and pay the money.

The opinion of the Court was delivered by KING, President, as follows :—

This case arises under a bill filed by the plaintiff against the defendant, to compel the specific execution of a contract for the sale of a house and lot of ground in the city of Philadelphia, entered into between the parties on the 8th of November, 1840. It is presented in the form of exceptions to the report of a master to whom it was referred, "to inquire and report whether a good title could be made by the plaintiff to the defendant of the messuage and lot mentioned in the pleadings." Before the master, various objections were made to the marketable quality of the plaintiff's title, all of which were decided by him in favour of the plaintiff. These objections have been reiterated in the exceptions taken by the defendant to the report. On the hearing, in addition to the objections taken before the master, the defendant insisted, that this court possessed no jurisdiction to give the plaintiff the relief prayed for in his bill. The whole case has received from the Court long and anxious consideration. It is a case of the first impression in Pennsylvania; no analogous proceeding exists in any precedent, and we have delayed pronouncing judgment, until it was fully matured, since our decision is final and conclusive between the parties.

The jurisdiction of this Court in Equity, to compel the specific execution of contracts, arises from one of the provisions of the 13th section of the Act of the 16th June, 1836, "relating to the jurisdiction and powers of Courts." This section among other things enacts, "that the Supreme Court, when sitting in Banc in the city of Philadelphia, and the Court of Common Pleas for the said city and county, shall have the power and jurisdiction of Courts of Equity," so far as relates "to the affording specific relief when a recovery in damages would be an inadequate remedy." It is from this section our authority in the premises is derived, or we do not possess it at all. It is truly said by the Supreme Court, in Gilder *v.* Merwin, 6 Wharton, 540, to the binding authority of which I unhesitatingly defer, "that the legislature have by no means conferred on us an universal or even a general equity jurisdiction, as seems to have been conceived by some : on the contrary, equity jurisdiction has been dealt out to us at distant intervals, and in limited portions, and we cannot usurp a jurisdiction not granted, nor exceed the limits within which the legislature has thought proper to prescribe it." Hence, unless the jurisdiction invoked is not plainly and clearly

given, we must refuse its exercise, and refer the plaintiff to the remedies afforded by the past practice of the Commonwealth.

The whole question of jurisdiction resolves itself into this proposition: Is a recovery in damages in Pennsylvania an adequate remedy for the vendor of land where, as here, the cash payments by the vendee are to be made by instalments, and the property is sold subject to existing encumbrances? I think it proper to state the precise case before us, rather than attempt the solution of the more entangled proposition, whether this Court can compel the specific performance by the vendee of a contract for the sale of land, on a bill filed by the vendor, where the object of the vendor is to compel the immediate payment of the money price of the land contracted to be sold in a gross amount. Because, if any doubt can exist as to the jurisdiction, under the head of specific relief, it must arise in this last case.

The principles and grounds on which Courts of Equity proceed in compelling the specific performance of real contracts, are well expounded by Sir John Leech, in Adderly v. Dixon, 1 Simons & Stewart, 607. "Courts of Equity decree the specific performance of contracts, not upon any distinction between realty and personalty, but because damages at law may not, *in the particular case*, afford a complete remedy. Thus a Court of Equity decrees performance of a contract for land, not because of the real nature of the land, but because damages at law which must be calculated upon the general money value of the land, may not be a complete remedy to the purchaser, to whom the land may have a peculiar value. So a Court of Equity will not generally decree performance of a contract for the sale of stock or goods, not because of their personal nature, but because damages at law calculated upon the market price of the stock or goods, are as complete a remedy to the purchaser as the delivery of the stock contracted for; inasmuch as with the damages, he may purchase the same quantity of the like stock or goods." The clause of the Act of 16th of June, 1836, is therefore but declaratory of the settled principles on which Courts of Equity have long acted, in the administration of specific relief.

The distinction taken at the bar between the case of vendee and vendor, in which the jurisdiction was conceded as to the former but denied as to the latter, is not new. As clearly as May 1722, in the case of Armiger v. Clark, Bunbury Rep. 111, in the Exchequer, the Lord Chief Baron took the difference. "If," says he, "a man comes for a specific performance *as to land itself*, a Court of Equity

ought to carry it into execution, because there is no remedy at law; but if it is to have a performance in *payment of money*, they may have a remedy for that at law." This doctrine seems to have been received with little favour. For, in Lewis *v.* Lord Lechmere, 10 Mod. 503–6, decided the same year, Lord Chancellor Parker refused to recognise it, though strongly urged at bar, saying "that the remedy the vendor had at law upon the article, was not *adequate* to that of a bill in equity for a specific performance." Sugden, chap. 4, sec. 3, treats this distinction as no longer existing, and asserts that if either vendor or vendee refuse to perform the contract, the other may bring an action for breach of contract, or file a bill for a specific performance. In Witting *v.* Cottal, 1 Simons & Stewart, 174, the Chancellor observes, "that in Equity the remedy between purchaser and vendor should be mutual." In Adderly *v.* Dixon, 1 Simons & Stewart, 607, Sir John Leech says, "it had been settled by repeated decisions, that the remedy in Equity must be mutual, and that where a bill will lie for the purchaser it will also lie for the vendor." If mutuality is to be the criterion of jurisdiction *here*, as it clearly seems to be in English Equity, then our jurisdiction in this bill is undoubted; for it is not denied to us in the case of purchaser against vendor. But if mutuality of remedy is too vague a standard in Pennsylvania, we have still left that of the adequacy or inadequacy of damages at law to afford a complete relief, and this point I regard as ruled against the adequacy of the remedy at law, by an action either for damages for the breach of contract, or for the recovery of the entire purchase-money, by the case of Huber *v.* Burke, 11 S. & R. 238. The whole course of the reasoning of the Court in that case, shows the difficulties under which our tribunals formerly laboured for the want of a Court of Equity, in order to fully carry out the respective rights and obligations of *vendor* and *vendee* on contracts for the purchase and sale of land. What is perhaps most important in that case, as bearing on the one before us, is the difficulty noticed by the Chief Justice in the way of an action brought by the vendor against the purchaser where the purchase-money is payable by instalments. He observes, that "it might possibly admit of a doubt whether the vendor, after having recovered one instalment, could bring a second action on the covenant; or whether he would have to wait until all the instalments should be due," a matter about which he declined intimating an opinion. Now the present is the case, not merely of payment by instalments, but where the purchaser was to give his

notes for these instalments. An agreement to give notes means negotiable securities. These, if the drawer is in good credit, the holder could immediately turn into money. An action of damages for the non-delivery of such notes or for the recovery of the amount of them when they would have matured, if delivered according to contract, cannot surely be estimated as equal to the actual delivery of the securities according to the terms of the contract. Such damages must necessarily be calculated upon conjecture, and an action would be no equivalent for the immediate delivery of negotiable securities. But this is not all, for a fact in this case exists not in the view of the Supreme Court in Huber v. Burke. The defendant made this purchase, subject to a mortgage of $9000 to Elijah Vansyckel: for such in my opinion is the legal effect of the agreement. In the case of Campbell v. Strum, 3 Watts, 60, the plaintiff by articles of agreement had agreed to convey to the defendant a certain tract of land, "subject to the payment of the purchase-money and interest now due to A.;" and it was held that this created a covenant on the part of the defendant to pay the purchase-money and interest. The consequence of the purchase being made subject to this large encumbrance, would have been to impose on the purchaser the obligation to indemnify the vendor from all liability arising from it had the contract been carried into effect. Would "a recovery in damages be an adequate remedy" for the loss of such an indemnity as this? This is the test of the jurisdiction in all cases of specific relief. What data could a jury proceed upon in computing damages under such a head of demand? It is because of the vague, arbitrary, and undefined nature of such a remedy, and the total absence of any standard by which it can be meted out, that the relief in equity is sought after. That tribunal severs all the involved legal knots in which the subject would be otherwise entangled, by the simple process of making the party recusant do that specifically, which he specifically agreed to do. A procedure which, when practicable, is alike recommended by natural reason and by equal distributive justice. On the whole case disclosed in the pleadings and proofs, I am of opinion, that a recovery in damages would *not* be an adequate remedy for the assertion of the plaintiff's rights under the contract, and that consequently the exception to the jurisdiction has not been sustained.

We are thus brought to the consideration of the other reasons urged by the defendant why our decree should not go against him. As these mainly arise from exceptions to the plaintiff's title to land, it becomes necessary to look into the principles on which Courts of

Equity in such cases grant specific relief; and what species of objections to the titles to land are deemed by them as sufficient to induce a refusal of their interference.

The specific execution of a contract in equity is not of absolute right in the party asking it, but of sound discretion in the Court. Hence it requires a much less strength of case on the part of the defendant to resist a bill to perform a contract, than it does on the part of the plaintiff to maintain a bill to enforce a specific performance: 2 Story, 78, 79; White v. Damon, 7 Vesey, 85. In Clows v. Higginson, 1 Vesey & Beams, 526, it is said by the Vice Chancellor to be a plain and obvious principle, that a Court of Equity is not *bound* to interpose by specifically performing the contract. And although the subject and import of the written contract are clear, so that there is no necessity to resort to evidence for its construction, yet if the defendant can show any circumstances, *dehors*, independent of the writing, making it inequitable to interpose for the purpose of a specific performance, a Court of Equity having satisfactory information on the subject will not interpose. This discretion is not however arbitrary, but exercised in a judicial manner according to established rules: 3 Atk. 187; 18 Ves. 111.

As a natural result of this doctrine, has arisen that of marketable titles. A marketable title in equity is one in which there is no doubt involved either as to matter of law or fact; and such a title only will a purchaser be compelled to accept: Atkinson, 3. It seems that a Court of Equity has no power in suits for specific performance, except on the application and consent of all parties to direct an issue for the determination of a matter of fact; nor can it without such an application or consent direct a case or an action for the purpose of satisfying itself on a matter of law: Roake v. Kidd, 5 Ves. 647; Prebole v. Boghurst, 1 Swint. 320; Sharp v. Adcock, 4 Russ. 375. Hence, if doubts arise either as to fact or law involved in the title, and the purchaser be an unwilling one, as his consent cannot of course be had to an issue on the case, the Court is deprived of the only competent means of informing its conscience, and is placed in the dilemma, either to take upon itself the decision of the fact or the law, which it would do at the hazard of what might be afterwards determined in a court of law, or to refuse to interfere on behalf of the vendor; an alternative it is entitled to choose on the principle that a bill for specific performance of a contract, is an application to the discretion of the Court, and a decree therefor cannot be claimed as a matter of right: Atkinson, 9. In

illustration of this doctrine, Lord Eldon in Stapleton *v.* Scott, 16 Ves. 272, remarks, that "it has been held repeatedly that though, in the judgment of the Court, the better opinion is, that a title can be made, yet if there is a *considerable, rational doubt* the Court has not attached so much credit to its own opinion as to compel a purchaser to take the title, but leaves the parties to law." This distinction between good and marketable titles seems peculiar to Courts of Equity, being unknown in Courts of Law, where the question is simply is the title good or bad: Romilly *v.* James, 6 Taunt. 274; 1 Marshall, 592. The equity doctrine seems to involve this result, that no title will be forced on a purchaser which is not so free from difficulty as to law and fact, that on a resale an unwilling purchaser shall be unable to raise any question which may appear to a judge sitting in equity, so doubtful that a title involving it ought not to be enforced. These are settled doctrines of English equity, and seem to necessarily arise from the constitution of strictly equitable tribunals. The urgent powers of these tribunals ought never to be applied, *in the exercise of any discretionary jurisdiction*, where doubts prevail as to the perfect soundness of the plaintiff's claim; or apparent justice characterizes the defendant's objections. The refusal to interfere does not absolutely repudiate the plaintiff's rights, if any he can establish. It only denies to him an extraordinary remedy, properly applicable only to cases in no respect equivocal.

The doubts however which will operate on a Court of Equity are not doubts made up for the occasion; not based on captious, frivolous, and astute niceties; but such as produce real *bonâ fide* hesitation in the mind of the Chancellor. The doubts must, in the language of Lord Eldon, be "considerable and rational," such as would and ought to induce a prudent man to pause and hesitate in the acceptance of a title affected by them.

Having thus ascertained the standard by which the objections to the plaintiff's title in this case are to be weighed, let us as briefly as practicable examine them in detail.

The first objection arises under a supposed defect of the writ of *alias levari facias*, under which the interest of Augustus Willis and Mary his wife in the premises was sold; and the supposed incompetency of the District Court, from whence the writ issued, to amend the defect. This interest became vested in Robert Patterson, who was the purchaser at sheriff's sale, through whom the plaintiff derived title to it. The defect consisted in the total absence of any description in the writ of the property sold, which was in this

respect a blank. In this objection there is no weight. First, because, the proceedings against Willis and wife being under their joint mortgage, the scire facias contained an accurate description of the mortgaged premises, and the defect in the subsequent *levari facias* could be fully supplied by it. The case of Small *v.* Mickley, 1 Rawle, 95, is direct to this point. There the writ of *venditioni exponas* was not returned at all, and the Court say that " whatever of form or substance there can be in a *venditioni exponas*, may be made out of the *fi. fa.* and docket entries, aided by the common forms of office without the writ." In the present case we have even fuller materials to remedy the supposed defect. We have the *scire facias*, which precisely describes the mortgaged premises. We have the judgment on that writ, which is in *rem*, and specifically authorizes the money to be made from and only from the mortgaged premises. We have the original *levari*, which contains the description of the property complete. We have the *alias levari* under which the sale to General Patterson was made, which directs the sheriff to levy the judgment as before commanded; and necessarily refers to the original on file. And finally, we have the sheriff's return and deed, duly acknowledged according to law, describing the property sold, and in all respects agreeing with the property described in the *scire facias* and original *levari*. In Thompson *v.* Phillips, 1 Baldwin, 272, it is said, " that in this state the reception of an acknowledgment of a sheriff's deed is a judicial act, in the nature of a judgment of confirmation of all the acts preceding the sale ; *curing* all defects in process on its execution, which the Court has power to act upon. When the acknowledgment is once taken, everything which has been done is considered as done by the previous order or subsequent sanction of the Court, and cannot afterwards be disaffirmed collaterally. The Court which directs the sale can alone judge of the legality of the acts done under its authority, and it follows that all questions arising under judicial sales, when their validity is questioned in an ejectment, must be those of *authority*, not irregularity or error, in awarding executions, or confirming process or acts in pursuance of it." But even if the District Court would have set aside this sale for the supposed defect in the *levari*, the time for such action was before the acknowledgment of the sheriff's deed. That Court would never have interfered after the property had passed through the hands of three purchasers : McCleary's case, 3 Yeates, 405 ; Blair *v.* Greenway, 1 Browne, 208. What would have been the action

of that Court even if timely application had been made to it, may
be inferred from the case of Owen v. Simpson, 3 Watts, 87.   There
the writ of *fieri facias* was correctly endorsed, but the body of it
referred to a different suit.   The writ was executed, and returned
by the sheriff as if the contents corresponded with the endorsement;
a *venditioni* issued, upon which the land levied on as the property
of the defendant named in the *endorsement* was sold; all the pro-
ceedings in the suit were otherwise correct.   It was held that the
*fieri facias* was amendable, and that the purchaser at sheriff's sale
acquired a good title.   But we are not called upon to theorize as to
what would have been the action of the District Court in the premises.
For, in point of fact, on the 28th of November, 1840, twenty-five
days after the date of the contract, and fifteen days after Mr. Craw-
ford's refusal to execute it on his part, the District Court permitted
the supposed defective writ to be amended.   The power of that Court
to order the amendment was, under the authorities of Owen v. Simp-
son, 3 W. 87, and Ordaneaux v. Prady, 6 S. & R. 510, undoubted;
and the time within which it was made, had it been at all necessary,
sufficiently prompt not to have defeated the defendant's alleged in-
tention of occupying the house in the fall.   On this ground I agree
with the master, that no valid objection exists as to the plaintiff's title.

The second objection to the plaintiff's title arises out of the mar-
riage settlement of Mrs. Caroline Patterson, one of the parties
through whom the plaintiff derives his title.   On the occasion of
her marriage, the estate of Mrs. Patterson, then Miss Caroline Ell-
maker, was conveyed to a trustee to hold for her separate use, with
power *inter alia* to change and alter "the whole or any part of trust
estate by sales, transfers, purchase, or otherwise, and as often as the
same should be done, that the moneys or other property purchased
therewith should be immediately taken and held upon similar uses
and trusts to those first declared."   Under this last power, the ground
rent originally existing on the lot in question was extinguished by the
trustee, Mrs. Patterson signifying her assent by joining in the deed.

The settlement of Mrs. Patterson differs from settlements made by
other married daughters of Mr. Ellmaker, in containing no express
clause, exempting the purchaser from seeing to the application of
the purchase-money.   The question under this exception is whether
such liability exists.

To hold of a purchaser from a trustee who has power to sell,
liable to the proper application of the purchase-money, has nothing
to recommend it to the Courts of this country.   Our policy is to

render titles to land as little embarrassed as practicable; and hence a Pennsylvania tribunal should lean against any extension of a doctrine which interferes with the convenient transmission of lands from hand to hand. Even in England, where feudal restraints on the convertibility of land into money have not been entirely shaken off, the doctrine is by no means a favourite. Mr. Butler, in his note to Co. Litt. 200, B. sec. 12, seems to incline to the opinion that the admission of the doctrine has been more productive of inconvenience than real good: that it retards, and often absolutely impedes the progress of business, involves the parties in expensive and intricate litigation, and is in other respects an useless expense. In Balfour v. Welland, 16 Ves. 156, Sir William Grant declares the doctrine to have been carried further than any sound equitable principle will warrant. "Where," says he, "the act is a breach of duty in the trustee, it is very fit that those who deal with him should be affected by an act tending to defeat the trust of which they have notice. But where the *sale is made* by the trustee *in* performance of his duty, it seems extraordinary that he should not be able to do what one should think incidental to the right exercise of his power: that is, to give a valid .discharge for the purchase-money." In these views Judge Story, in his Commentaries on Equity Jurisprudence, ch. xxx., coincides. He states correctly the general principle to be this: "that wherever the trust or charge is of a defined and limited nature, the purchaser must himself see that the purchase-money is applied to the proper discharge of the trust; but whenever the trust is of a general and unlimited nature, he need not see to it." Even where the trusts are defined and yet the money is not merely to be paid over to third persons, but is to be applied by the trustees to certain purposes which require on their part time, deliberation, and discretion, it seems that the purchaser is not bound to see to the due application of the purchase-money: Story Com. on Equity, vol. 2, 338, § 134. The case of Warmley v. Warmley, 8 Wheaton, 422, is referred to as illustrating this doctrine. There Judge Story, delivering the opinion of the Court, says, "there is much reason in the doctrine that where the trust is defined in its object, and the purchase-money is to be reinvested upon trusts which require time or discretion; or the acts of sale and reinvestment are manifestly contemplated to be at a distance from each other, the purchaser shall not be bound to look to the application of the purchase-money; for the trustee is clothed with discretion in the management of the

7          E

trust fund, and if any persons are to suffer by his misconduct, it should rather be those who have reposed confidence in him than those who have bought under an apparently authorized act." Doran *v.* Wilshire, 3 Swanton, 699; Wood *v.* Harman, 5 Madd. 358; Garnett *v.* Mason, 2 Brocken. 234; Lenning *v.* Peyton, 2 Dessausure, 375, are cases which may be referred to as identical in principle with the present, and from which may be extracted the doctrine, that whenever a trustee empowered to sell, is at the same time authorized and required to reinvest the avails of the trust property, under the same trusts with which the original estate was clothed, the purchaser is discharged from all obligation to see to the proper application of the purchase-money, paid by him to the trustee. And it is difficult to perceive how it could practically be otherwise. Reinvestments are eminently matters for the exercise of sound discretion. The failure of a due exercise of such discretion may involve the trustee in direct personal liability for a breach of trust. To coerce precipitate action by the trustee may be most deleterious to the trust fund; while to keep the purchaser in a state of suspended liability, until such reinvestment is properly made and duly secured according to the terms of the trust, would embarrass, if not totally nullify the whole power to sell. A more ingenious mode could hardly be devised of clogging the negotiability of trust property, and thereby depreciating its value, than the establishing of such a doctrine. I will only notice the fact that the settlements made by the other daughters of Mrs. Ellmaker contained a clause expressly exempting purchasers from liability for the application of the purchase-money, by saying that it can have no influence on the decree of this question. Accident; the employment of a more accurate or cautious draftsman, in these instances; or the opinion of the drawer of this instrument that from the nature of this trust, such a liability could not exist and was not required to be provided against, might have produced the variance. But, however this may have been, these settlements were acts among strangers; and the maxim, "*res inter alios acta alteri nocere non debet,*" applies to them.

In this exception, according to my judgment, plaintiff has also failed.

The third objection arises from the defect in the power of attorney, executed by Robert Patterson and wife to William Patterson, dated June 13th, 1840, by which the latter was authorized to convey the right of General Patterson in this ground, as purchaser at sheriff's sale of the interest of Augustus P. Willis and Mary E. his wife, late Mary E. Ellmaker. The defect consisted in the certificate of the

acknowledgment of the letter of attorney by Mrs. Patterson, not setting forth that the contents of the instrument had been previously made known to her.

I agree in opinion with the master, that this defect is cured by the confirming act of the 16th of April, 1840. The language is broad: "No grant, bargain and sale, feoffment, deed of conveyance, lease, release, assignment, *or other assurance* of any lands, &c., *bonâ fide* made and executed by husband and wife, and acknowledged by some judge and authorized by law, &c., executed before the first of January next—shall be held or adjudged invalid or defective, or insufficient in law, by reason of any informality or omission in setting forth the particulars of the acknowledgment, &c." The only question under this law, is, whether a power of attorney from husband and wife authorizing a third person to sell and convey specified land belonging to the husband, is "an instrument of conveyance" of land, of which, at this time of day, a doubt ought not to be entertained, if ever such a doubt would have been legitimate. Such has certainly been the received opinion and practice of the state, and a contrary doctrine could not fail to shake many titles and produce the most disastrous litigation. The question I consider too clear for argument.

The last objection made before the master, arises from the circumstance of the existence of an outstanding judgment against Elijah Vansyckel, the immediate owner of the property before the plaintiff, in favour of Abraham Piexoto. This was a judgment under an award of arbitrators for $1701.87½, and while it subsisted was an abiding lien on the property, and so far vitiated the title. Satisfaction was not entered on this judgment until the 26th of April, 1841, when it was released by Piexoto's attorney. Of course, when the defendant Crawford refused to execute his contract, this judgment was in full operation, but it was satisfied before the hearing before the master. It is undoubtedly true that where an encumbrance is discovered, the vendor must discharge it before he can compel the payment of the purchase-money at law or equity. But here the refusal by the defendant to execute his contract was general, and without specification of the existence of this judgment as a cause of exception to the plaintiff's title. From the evidence, it is more than probable that the existence of this judgment was an after discovery. For, according to the testimony of the defendant's conveyancer, the objections made to the title arose from the supposed liability of the purchaser to look to the application of the purchase-money, under

Mrs. C. Patterson's marriage-settlement; from the supposed defect
in the acknowledgment of General and Mrs. Patterson's power of
attorney; and from the defect in the writ of *fieri facias*, under which
the interest of Mrs. Willis was sold. Not one word is said by this,
or any other witness, that this judgment was considered by either
party. The negotiation actually fell through, by Mr. Crawford's
absolute refusal to complete the contract, before the parties had
arrived at the point of searching for encumbrances. We all know
that in the practice of Pennsylvania conveyancing, searching for en-
cumbrances is the last step in the consummation of the bargain. A
prudent conveyancer generally first has the deeds executed, and then
examines for liens. This is done to avoid the hazard of the entry
of judgments, or the recording of mortgages pending the negotiation.
Sales are every day made of real estate charged with encumbrances,
it being the intent and understanding of the seller to discharge them
out of the purchase-money on the completion of the sale. To raise
money to discharge such liens (operating frequently, as in the case
of judgments, on all the seller's property) is often the chief induce-
ment for the sale. It would be most unjust, where the buyer has
refused to accept the seller's title from different reasons, that he
should be at liberty, when foiled in the exceptions actually made, to
retreat behind encumbrances, not made the subject of exception, and
which, if they had been, might have been cleared off by the vendor.
The true rule in such cases is found in the case of Hampton *v.* Speck-
anagle, 9 S. & R. 212, which, from having been concerned as coun-
sel in it while at the bar, I know to have been vigorously contested.
There the court held, that where a purchaser had refused from other
reasons than the existence of encumbrances to complete his purchase,
the seller could recover damages for the purchaser's breach of con-
tract, if he was able to satisfy the jury that the encumbrances were
of such a nature that he could and would have removed them, had
the purchaser been willing to accept a conveyance. This is also the
English rule. In Townsend *v.* Camperdown, 1 Y. & J. 449, it is
held, that, although the estate is sold free from encumbrances, and
the abstract shows an amount of encumbrances *exceeding* the pur-
chase-money, yet it must be considered that the seller can make a
good title, and for this plain reason, that from the existence of such
encumbrances, no fair inference can be drawn that the seller has
neither the ability nor disposition to remove them, if the purchaser
is otherwise content to execute his part of the bargain. It would
be a most unreasonable thing to ask a vendor to extinguish money

liens on his land, until it was ascertained that the vendee would complete his purchase. In the nature of things this is a step immediately preceding the consummation of the final treaty. To maintain this doctrine might indeed subserve the advantage of this defendant, but it would produce the greatest public inconvenience. The existing practice of conveyancers has originated in the practical common sense of the business community, and is sustained by the soundest principles of law and the clearest dictates of distributive justice. The rule of Specknagle v. Hampton, is the true one at law. Where the vendor of an encumbered estate seeks to recover damages for a breach of contract by the vendee, he must prove that he could and would have removed the encumbrances had the defendant kept his part of the contract. In equity, on a bill to enforce specific performance, such a vendor must show that he could, within a reasonable time, have removed the encumbrances, had the vendee waived his other unsound objections to the title, and he must actually extinguish them before the Court compels payment of the purchase-money. The ability to extinguish is of course a question of evidence, but to my mind the evidence to that point is perfectly satisfactory. The cash payment to be made by the defendant was $1500, within $200 of the amount of the judgment: he was to give the plaintiff two notes, one for $500 at six months, and another for $4000, at eighteen months. Are not here ample means to extinguish a judgment for $1700, not payable instanter, being upon an award of arbitrators appealed from? When to these we add the fact, that in five months after the date of the contract, and before the hearing before the master, the judgment was actually satisfied, can any one doubt that there are enough proofs in the the case to show that if Mr. Crawford had required the release of Piexoto's judgment as a pre-requisite to the acceptance of the plaintiff's title, it would have been promptly done? The existence of this judgment I do not think, under the circumstances disclosed by the evidence, furnishes any reason why the defendant should not now be called upon to execute his contract.

Another and a most grave objection has been made on the hearing, which was not mooted before the master. This, according to equity practice, is irregular: 4 Madd. 111; Brooke, 5. In a case like this, however, arising in the infancy of our chancery jurisdiction, this strictness will not be adhered to; although its manifest convenience is such, that we shall expect it hereafter to be complied with.

The objection amounts to nothing less than that a married woman in Pennsylvania cannot sell her land or bar her dower by power of

attorney, although such power is sufficiently acknowledged, had it been a direct deed in which she had joined her husband. This objection arises under the deed made by William Patterson, attorney of Robert Patterson and wife, by which the interest originally of Willis and wife, which had been purchased by Robert Patterson at sheriff's sale, was conveyed to Dalzell, the plaintiff.

The present is the first instance in which this question has been directly raised in the courts of this state, and is one which, if well founded, is calculated to shake many titles heretofore deemed good. It is true that in Sweigart v. Burk, 8 S. & R. 299, it was ruled that a power of attorney executed out of the state by husband and wife, and acknowledged before a justice of the peace, was not sufficient to authorize the attorney so named to convey the wife's lands in Pennsylvania, by deed executed in pursuance of such power. But this decision was put not on the broad ground of the inefficacy of a power of attorney by husband and wife to convey title to the wife's land, but on the ground of the insufficiency of the acknowledgment under the Act of Assembly regulating the acknowledgments of powers of attorney for the conveyance of land in the state, but executed out of it. There is no intimation of a doubt by court or counsel, that if the power had been duly acknowledged by the wife, it would have been otherwise than sufficient. Sweigart v. Burk may therefore be fairly taken as an authority against the defendant's position, impeaching a conveyance by an attorney duly constituted by husband and wife. Morgan v. Stell, 5 Binn. 305, is a case of the same character as Sweigart v. Burk. There the question was as to the validity of a deed executed by Nicholas Holliday, an attorney in fact of Mr. and Mrs. Turner Camac, of land belonging to Mrs. Camac, after a subsequent power had been given to him jointly with Thomas Law and Benjamin Chew. The case was ruled against Mrs. Camac, on the ground that the defendant was a *bonâ fide* purchaser without notice of the revocation of the first power. The case was argued by Hopkinson and Rawle for the plaintiff, and by Binney and Wallace for the defendant, and the opinions of Judges Tilghman, Yates, and Breckenridge, given *seriatim*. In neither the arguments made, nor opinions delivered by these eminent personages, is the idea started, that Mrs. Camac's power could not give authority to her attorney to execute a deed of her land. It is not likely that this omission would have been made by such counsel and such a Court, if an objection of this character had been esteemed to be of any force.

The language of the declaratory act of the 24th of February,

1770, in reference to deeds executed by *femes covert*, and acknowledged under a separate examination, is of the broadest and most extensive character: "Where any husband and wife shall *hereafter incline to dispose of* and convey the estate of the wife, and of her right of, in, and to any lands, &c., it shall be lawful for the said husband and wife to make, seal, deliver, and execute any grant, bargain, and sale, lease, release, feoffment, deed, *conveyance*, or *assurance whatsoever*, for the lands, &c., intended to be passed and conveyed." And it declares that such deed or conveyance being acknowledged in the manner prescribed, shall be "good and valid in law to all intents and purposes, as if the said wife had been sole and not covert at the time of such sealing and delivery." Now, is not a power of attorney under seal, authorizing a third person to execute a deed of land belonging to the constituents, an "assurance in law?" The phrase, assurance, is technical. The legal evidences of the translation of property are called, says Blackstone, the common assurances of the kingdom; whereby every man's estate is assured to him, and controversies, doubts, and difficulties, are either prevented or removed: 4 Com. 294. The power from the principal and the deed from the attorney, in pursuance of it, are in effect but one instrument. In a community like Colonial Pennsylvania, where many of the proprietors of the soil were residents in the mother country, the efficacy of conveyances *through* attorneys was of vital importance. Hence by the third section of the act of 1750, for "confirming sales of lands by attorneys or agents, &c.," it was declared that all conveyances of lands made by virtue of any letters or powers of attorney duly executed, "should be good and effectual in law, to all intents, constructions, and purposes whatsoever, as if the constituent or constituents had by their own deeds, bargains, and acts, actually and really sold and delivered the same." It was then the settled practice of the province for husband and wife to join in deeds conveying the wife's interest in lands: Daney *v.* Turner, 1 Dall. 12; and is not the presumption irresistible, that the general and stringent terms of this law were intended to embrace conveyances made by attorneys created by husbands and wives? The first time from bar or bench I ever heard it questioned was on the argument of this case, and I am quite clear that it has no sound legal foundation to rest upon.(*a*)

---

(*a*) Since this judgment was pronounced, I have been referred to the case of Fulweler *v.* Boughter, 15 S. & R. 45, 55, in which the Supreme Court has ruled that a wife can convey her interest in lands by power of attorney, executed by her after a separate examination.

But if the objection was tenable, it was cured the moment it was made. It was not one of the objections taken by the defendant's scrivener, nor was it urged before the master. From the fact that the moment that it was stirred here, a deed of confirmation was obtained from General Patterson and wife, it is probable, if not certain, the same thing could have on either of these occasions been procured by the plaintiff if required by the defendant. If in the progress of a suit for specific performance of a real contract, objections to a title are discovered, never made during the negotiation, the defendant cannot insist on such objections as excusing him from performance, if the plaintiff is able and willing to remove them when first pointed out.

In respect to the time of completing the contract, the modern doctrine in equity requires of a vendor asking its aid, to compel specific performance of a contract, to show himself ready, prompt, and eager; and that, therefore, time alone is a sufficient bar to the aid of the Court. Due diligence is necessary to call the Court into activity, and when it does not exist, a Court of equity will not lend its assistance. But the rule is mutual, and applies to both parties, and a purchaser will not be assisted when he has made frivolous objections to the title, and trifled or shown backwardness to perform his part of the agreement; especially if circumstances are altered: Sug. vol. 1, 501, 9th ed. Time, unquestionably, is regarded in equity as of the essence of the contract, where, from the nature of the estate, the uses to which it was intended to be applied by the purchaser, or from anything else, it is shown so to have been regarded in framing the contract. In this case it is to be remembered, that in the contract no time is specified when the title is to be completed. In such a case a reasonable time, having regard to all the circumstances, must be accorded. And if we consider the objection tenable to the form of the *levari facias*, under which Mrs. Willis's interest in the ground rent was sold (the only objection made by the conveyancer having, in my opinion, any plausibility), the time taken by the plaintiff to remove it was not unreasonable, even if Mr. Crawford intended an immediate occupation of the house as a residence. The question as to the materiality of time, can only arise in that class of cases in which legitimate objections are made to the plaintiff's abstract of title, and the question occurs whether he has removed them in due season. But in my opinion there was no objection *made* that required amendment in this plaintiff's title. The encumbrance was not mentioned, and could have been removed by the plaintiff. In this view of the case, the fact that the defendant purchased this house as a resi-

dence, and desired possession at a convenient season, supposing it to be established, cannot help the case. The only effect such a circumstance of personal convenience can have, in any case, would be the requirement of the prompt removal of available objections made by the purchaser. But where the objections raised are such as are not deemed tenable, or such as a vendor is required to obviate, no equity in favour of the purchaser can be raised from them. And, as has been shown, the only objection raised of any value was corrected soon enough to leave the defendant still obliged to perform his contract.

The last matter for consideration is, whether the defendant's exceptions to the plaintiff's title, taken in conjunction with the opinions of his scrivener and counsel, regarded separately or in the aggregate, exhibit one of those titles, which, though not positively bad, yet is of that doubtful character which a Court of Equity, in the exercise of a discretionary jurisdiction, will not force on an unwilling purchaser. For the purpose of this defence, it is sufficient that the latter title is doubtful.

The cases in which Courts of Equity have refused their aid to a vendor, where they have considered his title good, though disputable, are cases of real and serious difficulty, such as Moulin, 3 P. Wm. 198; Chapman *v.* Smith, 1 Brown, 75; Cooper *v.* Denn, 1 Ves. C. C. 165; Stapleton *v.* Smith, 11 Ves. 272. The doubt, to have this effect, must be what Lord Eldon, in Stapleton *v.* Scott, 11 Ves. 27, calls "a considerable, a rational doubt." The danger of lending too ready an ear to such objections are well observed upon by Lord Eldon in Vancover *v.* Bliss, 11 Ves. 465. Speaking of the practical working of the equity doctrine of doubtful titles, he observes: "It is scarcely possible to represent the difficulties that have arisen from it; especially when persons under the description of land-jobbers, are going about looking for these things, and persons imprudently enter into contracts with them. Whenever a contract is made for the purchase of land, though no doubt has ever been entertained upon the title, no one thinking of disputing it, if the purchaser has a good bargain, he overlooks all these objections; but if he finds he cannot sell the estate as well as he wished, or cannot enjoy it to his satisfaction, the first thing is, that the abstract goes to some one, for the express purpose of finding out objections, and *opinions* are given on both sides. I feel great concern for the owners of this sort of property. The consequence is not only the misery arising from the uncertainty whether that which they have been enjoying with happiness, and upon which their families are subsisting, is their property; but

it is an invitation to all who may fancy they have an interest in it to make an attack." The circumstance so warmly dwelt upon during the argument, that the defendant's scrivener and counsel objected to this title, is of no other weight than as requiring of us a more careful scrutiny, before we adopt what others, whose opinions are of unquestioned value, have repudiated. To this legitimate extent it has been considered, but as a substantive reason in favour of the defendant it cannot prevail. In Deverell v. Lord Bolton, 18 Ves. 506, Lord Eldon ruled that "where an abstract is laid before the counsel who approves the title, his approbation is not to be taken as against the person consulting him as a waiver of all reasonable objections, for the Court cannot compel a specific performance on ground of an opinion that it may think wrong." If this is true where the opinion of counsel is invoked against a purchaser, it must be as true where it is offered in his support. On the whole case I am of opinion that no such exception to this title has been shown as would justify a Court of Equity in refusing a decree for a specific performance. There must be a decree accordingly.

The Court doth order and decree that the agreement on the pleadings mentioned, dated the third day of November, 1840, be specifically performed and carried into execution. And it is ordered that it be referred to Joseph A. Clay, Esq., as Master, to inquire and report what sums of money have been paid by the complainant for taxes and water rents of the premises in the said agreement mentioned, accruing since the said 3d of November, 1840, and for interest on the mortgage hereinafter mentioned, accruing since the said day, and for necessary repairs of the said premises since the said day. And upon the plaintiff executing and delivering to the defend- ant a proper conveyance of the estate and premises contained in the said agreement, subject to the encumbrances therein mentioned, to wit, a mortgage for $4700, dated May 1st, 1827, from James M'Clurg to William Chamberlain ; and also a mortgage for $4300, dated July 31st, 1840, from the plain- tiff to Elijah Vansyckel—such conveyance to be settled by the said Master if the parties differ about the same.—It is ordered that the defendant do pay the plaintiff the sum of $6000, the purchase-money, and what the Master shall report to be due to the plaintiff as aforesaid, on the amounts afore- said, and the parties are to be at liberty to apply to the Court as they shall be advised.