## Finley *versus* Aiken.

Grant.
1g   83
L197 300
197  301

1. Specific performance of a contract for the sale of land may be decreed under our laws, at the suit of the vendor against the vendee.

2. If one of the contractors for the sale and purchase of land be dead, the only

[Finley *v.* Aikén.]

form of remedy for non-performance of the contract is by decree for specific performance in the Orphans' Court.

3. The remedy for a breach of contract for the sale of lands by covenant, is bungling and inadequate; the equity remedy is better, and ought to be encouraged.

4. In the usual equity language, the term "specific relief" is a generic term, including "specific performance" as one of its species.

5. A recovery in damages is not in equity regarded as an adequate remedy for a breach of contract for the sale of land.

6. A recovery in damages is regarded as an inadequate remedy in cases where they are estimable only by conjecture, and not by any accurate standard.

In Chancery.—Appeal from the decree of the District Court of *Allegheny county.*

Complainant's bill charges—That an agreement was made May 10, 1851, between Levi Finley and John Aiken, for the sale, by Finley to Aiken, of two lots in Pittsburgh, for the sum of $6000. Deed and possession to be given October 1, 1851, when $2000 was to be paid, and $4000 secured by bond and mortgage on the premises, payable in four annual instalments of $1000 each, on the 1st days of October, 1852–3–4 and 1855, with interest payable semi-annually from October 1, 1851. Policy of insurance on the buildings and lots to be delivered to Aiken.

That Finley delivered the policy to Aiken. That, by verbal agreement, the time of possession was changed from October 1, 1851, to July, 1, 1851, when Aiken took possession, and received the rents and profits.

That on October 1, 1851, Finley tendered the deed to Aiken, and offered performance of his part of the contract, and that Aiken refused to perform his part of the agreement, alleging that Finley could not make him a good title to the lots.

The bill puts no interrogatory—prays that Aiken may be compelled to answer, that specific performance may be decreed, and for general relief.

To this the respondent demurred, for want of jurisdiction in the court.

The demurrer was overruled, after argument, and respondent was directed to answer.

Respondent answered—That he admitted that he did, on May 10, 1851, enter into articles of agreement with Levi Finley, for the sale and purchase of two lots of ground in the city of Pittsburgh, and that the articles were correctly recited in the bill. But he averred that, before, and at the time of the execution of the said articles, complainant assured him that he, complainant, owned a brick wall of the height of eight feet, of the thickness of nine inches, and extending fifteen feet, on the line of the ground sold, and that he owned the ground on which this wall stood; that he owned the whole of a privy, and the whole of the ground on which it stood, and that they were embraced within

the limits of the lots agreed to be conveyed from complainant to respondent, and formed a part of them. That complainant, before the execution of the articles of agreement, took respondent to the premises, and pointed out to him this wall and privy, and assured him that they stood on the ground agreed to be conveyed to him, and he averred that he never would have agreed to purchase the property at all, but for complainant's assurance, that the wall and privy stood within its limits.

He admitted that, in pursuance of a verbal agreement, he entered into possession of the lots July 1, 1851, instead of October 1, 1851, as provided in the articles of agreement, but he averred that the agreement, under which he took possession, was, that he should pay to Levi Finley $120, four months' interest on the purchase-money, which he did pay to him, and that he, respondent, should collect the four months' rent of the premises preceding the 1st of October, 1851, and that he entered into possession so far as to collect the rents aforesaid.

But that after he had so taken possession, and before October 1, 1851, when he was to receive the deed, he discovered that Finley did not own the wall aforesaid, and the ground on which it stood, and that he did not own the whole of the privy, and the ground on which it stood, but on the contrary, the whole of the wall stood on an adjoining lot, and four and a half inches of the privy, in the line of the wall, stood on the adjoining lot; and in addition to this, the wall stood one and a quarter inches within the line of the adjoining lot on which it was built.

He further averred, that after he had taken possession, and before October 1, 1851, he discovered that there was a mortgage on the premises for $327.79, which did not become due for six months after October 1, 1851, when he was to receive his deed, and satisfaction was not entered on the mortgage until June 17, 1852. That when he took possession so far as to collect the rents as aforesaid, he intended and expected to continue the possession after October 1, 1851, when he should get his deed. That he had $2000 in the hands of a broker in Pittsburgh, ready to meet his contract on October 1, 1851, on Finley's compliance with his part of the contract—that he kept the money ready for some two or three months after October 1, 1851—that he offered to comply, fully, with his part of the agreement, on Finley's making to him the deed to which he was entitled; and finally, on January 29, 1852, he gave to Finley written notice, (as he had before, on or about January 1, 1852, given him verbal notice,) that he, Aiken, would have nothing further to do with the matter, as he, Finley, had failed to comply with his contract, and make to him such a deed as he was entitled, under the contract, to receive. That when, on or before January 1, 1852, he gave Finley notice that he would no longer hold himself bound by the contract, he

[Finley *v.* Aiken.]

offered to restore to him possession of the premises, which he had taken for the purpose of collecting the four months' rent as aforesaid, and Finley refused to receive it, and that he collected or received no rents for the premises except the four months' rent, for which he paid Finley the $120 before mentioned. He denied that complainant offered, on October 1, 1851, or at any other time, to perform his part of the contract, by the delivery to respondent of the deed to which he was entitled, or that he ever had the power to make him such deed. He admitted that he had received from Finley the policy of insurance, and he averred that, before he became aware of the defect of title, he renewed it for one year at his own expense. That he did not offer to return the policy to Finley, because he had refused to receive possession of the lots, and the policy remained in the hands of respondent, subject to the use of the complainant, if circumstances should make it of value to him.

July 30, 1853, the case came on to be heard on bill, answer, replication, and testimony, and was argued by counsel, and thereupon it was ordered, adjudged, and decreed, that the respondent should specifically perform the contract—pay the costs of the suit, and, on failure of payment, execution as at law to issue against respondent.

August 30, 1853, respondent, John Aiken, appealed, and complained that the court erred—

1. In taking jurisdiction of the case.
2. In decreeing performance of the contract.

*Black* and *Washington*, for appellant.—Upon the question of jurisdiction. The bill shows a plain contract, and charges a breach, on account of alleged defective title. Equity jurisdiction is limited in Pennsylvania, and we must look to our Acts of Assembly for it. There is no fraud on the part of Aiken, no mistake, trust, or account, express or implied, in the case; and if the court have jurisdiction, it must be under the 13th section, 5th article, of the Act of 16th June, 1836, for "the prevention or restraint of the commission, or continuance of acts contrary to law, and prejudicial to the interests of the community, or the rights of individuals;" or under the 6th article of the same section, "for affording specific relief, where a recovery in damages would be an inadequate remedy."

There is nothing *contrary to law*, in refusing to take a defective title. In *Gilder* v. *Merwin*, 6 Wh. Reps. 541, the court refused equitable relief against an execution on a judgment alleged to have been fraudulently obtained, on the ground that there was nothing *contrary to law* in issuing an execution on a judgment. The limited chancery powers of the courts of Penn-

sylvania extend only to prevent acts contrary to law. *Hagner* v. *Heyberger*, 7 W. & S. 104.

There is nothing *prejudicial to the interests of the community or the rights of individuals*, in refusing to take a defective title. In the first place, it did not appear, at the time of the demurrer, for want of jurisdiction, who was right, in point of fact, Finley or Aiken. In *Mange* v. *Guenat*, 6 Wh. Reps. 144, 145, the court refused to grant possession, or inspection, of title deeds, not knowing which party was entitled to them. The same uncertainty existed here. The bill itself showed that Aiken's refusal to perform, rested on an alleged defect of title, and the court, having received no evidence in the case, could but take it as it was presented by the bill and the demurrer, and should have sustained the demurrer, and declined to take jurisdiction of the case.

Further, if the refusal to take a defective title is *prejudicial to the interests of the community or to the rights of individuals*, in the sense of the Act of Assembly, what breach of contract is not alike contrary to law and *prejudicial to the rights of individuals*, and the ground of equity jurisdiction? Under this construction of the Act of Assembly, would not the legislature, instead of extending a limited equity jurisdiction to our courts, have given to them chancery powers without a limit?

Convenience does not give equity jurisdiction, and permit a party to proceed in chancery because he may prefer that to his remedy at law.

If we are right in our views of this matter, and we are sustained in them, as we have shown by the decisions of our Supreme Court, there is nothing contrary to law and prejudicial to the rights of individuals, in this case, that gives jurisdiction to the court. Jurisdiction must then be found under the 5th article of the 13th section of the Act of June 16, 1836, affording " specific relief when a recovery in damages would be an inadequate remedy," or it cannot be found at all. *Kemshall* v. *Stone*, 5 Johns. Ch. R. 165 ; *Hatch* v. *Cobb*, 4 Id. 559.

*Upon the question of specific performance.*—The representations were false and deceptive.

Aiken considered the wall and privy of great value, as he had a very good right to do. After he had executed the paper he discovers that fraud and falsehood have been practised, and very early, according to Beck's testimony and other proof, repudiates the contract, because he had been deceived in regard to the wall and privy.

If James Hoag is to be believed, Finley not only represents the wall as his, but studies with some care how far he could go in falsehood. For he admits that he had sold the wall and property as it stood, but expressed his sense of security, not by any explana-

tion of what he had said, but in the law knowledge he had got somewhere about solemn instruments of writing.

It is not necessary for us that we should seek either to reform or contradict the instrument. It is enough that we allege and show that we were drawn in to execute the paper by false representations of the ground it would convey. Finley admits that he did sell the wall and privy, both of which are on the ground, pointed out, as Aiken alleges, by him previous to the sale. *Flagler* v. *Pleiss*, 3 Rawle, 345, 346; *Rearich* v. *Swinehart*, 1 Jones, 240; *Renshaw* v. *Gans*, 7 Barr, 119; *Hurst's Lessee* v. *Kirkbride*, 1 Binn. 616; *M'Cullough* v. *M'Kee*, 4 Har. 289; *Campbell* v. *Spencer*, 2 Bin. 133; *Patterson* v. *Martz*, 8 W. 379; *Fisher* v. *Worrall*, 5 W. & S. 483; *O'Rouke* v. *Percival*, 2 Ball. & Beatty, 62; *Hunt* v. *Moore*, 2 Barr, 105; *Tyson* v. *Passmore*, Ib. 124.

*C. Shaler & Co.*, also for appellant, refer to 2 Hovenden on Fraud, 4; Sugden on Vendors, 248; 1 Br. Ch. R. 410; *Clowes* v. *Hutchinson*, 1 Ves. & Be. 524; *Haxton* v. *Lister*, 3 Atk. R. 385; *Cadmar* v. *Homer*, 18 Ves. 10; *Clarke* v. *Grant*, 14 Ves. 519; *Clermont* v. *Tasbrug*, 1 Jacobs & Walker, 112.

*Geo. P. Hamilton*, for appellee.—On the question of jurisdiction. The jurisdiction, in this case, arises under article 6, sec. 13, Act of 1836, or it does not exist at all. The section of the act referred to gives to our courts, among other things, the power and jurisdiction of courts of equity, so far as relates " to affording specific relief, where a recovery in damages would be an inadequate remedy." This act does not confer universal, or even general equity powers, but in the particular cases where the jurisdiction has been granted, it is as extensive as in England, or under the Federal government. Under the head of specific relief, the test of jurisdiction is the same here as in England,—the capacity of the courts of law to afford a plain and adequate remedy. The remedy at law, to oust equity of jurisdiction, must be plain and complete. 11 Conn. 112; 2 Johns. 310; 2 Vesey, jr. 316; 10 Johns. 395. Justice Story, (in his equity, vol. 2, page 25,) says : " The truth is, that, upon the principles of natural justice, courts of equity might proceed much further, and insist upon decreeing a specific performance of all bona fide contracts, since that is a remedy to which courts of law are inadequate."

The remedy at law must not only be adequate, but plain and direct; hence circuity of action will give jurisdiction in equity. 2 Story's R. 648. The statute conferring jurisdiction is but declaratory of the settled principles on which courts of equity have long acted, in the administration of specific relief. *Dalzell* v. *Crawford*, 1 Parson's Equity, 37; *Farly* v. *Stokes*, Ib. 431.

It is no objection to the jurisdiction, that similar cases have

[Finley *v.* Aiken.]

been remedied in Pennsylvania by the application of equitable remedies to our common law proceedings. *Church* v. *Moore,* 10 Barr, 274.

The assumption of equitable relief by common law courts, never ousts the original jurisdiction of chancery. 5 Vesey, 235; 7 Vesey, 247 ; 17 Johns. 388.

. These authorities prove that the cases in Pennsylvania, where adequate relief has been administered by the application of equity principles and practice, to our common law forms, are not legitimate precedents to disprove the jurisdiction in the present case.

Would a recovery in damages in this case be a plain and adequate remedy for the complainant?

The only remedies given by law in affirmance of the contract, are covenant and debt. The former is technical, and sounds purely in damages. 5 B. & C. 460 ; *Huber* v. *Burke,* 11 S. & R. 244.

In *Witman* v. *Ely,* 4 S. & R. 266, it is said, the vendor cannot go for damages or the purchase-money, according to the case he may make out ; this would involve the absurdity of an arbitrary discretion in the jury, to hold the vendor to the bargain, or absolve him from it.

Finley was entitled, by the terms of the contract, to the bonds of Aiken, secured by a mortgage on the premises, for the payment of the purchase-money. These bonds, secured by a mortgage, and bearing interest, to say nothing of the personal security of the obligor, Finley, doubtless, could have converted into cash, or used as such in his business. It was also important to Finley, and perhaps equally so to both parties, that the contract between them should be consummated by a conveyance, and the execution and delivery of the securities, so that in the event of the death of either or both, there would be no occasion to resort to the Orphans' Court to prove the agreement, and obtain a decree for the specific performance of it. In order to avoid such contingency, and the expense and trouble resulting from it, the practice has become general in Pennsylvania to convey the legal title, and take the bond and mortgage of the purchaser for the purchase-money. *Witting* v. *Cattal,* 1 Simons & Stewart, 174 ; *Tiernan* v. *Roland,* 3 Har. 429 ; *Hagner* v. *Heyberger,* 7 W. & S. 104 ; *Hatch* v. *Cobb,* 4 Johns. Ch. R. 559 ; *Moore* v. *Wesley Church,* 10 Barr, 280 ; *Kirkpatrick* v. *M'Donald,* 1 Jones, 392.

On the merits of the case.

The answer and evidence present three objections to the relief claimed by the complainant.

1. That the complainant did not perform, nor offer to perform, in time, his part of the contract.

2. The existence of encumbrances upon the title, viz: The mortgage in favor of Prince.

[Finley *v.* Aiken.]

3. Deficiency in the quantity of ground.

These objections were made at different times during the pendency of negotiations before suit brought, and in the order in which they are now presented.

1. Did the complainant offer, in time, to comply with his part of the contract?

The agreement required the deed to be delivered on the 1st of October, 1851, when the cash payment of $2000 was to be made. On the 10th of the same month and year, complainant informed the respondent that he had his deed ready for him, and demanded of him his cash payment, which the respondent refused, on the ground that the property was covered by liens.

Time · is not of the essence of a contract for the purchase of real estate, unless expressly made so by the parties, or to be clearly implied from the attending circumstances. *Remington* v. *Irwin*, 2 Harris, 143; *Tiernan* v. *Roland*, 3 H. 427.

Neither at law or in equity is time of the essence of a contract for the sale of real estate. 14 Peters, 372; Leading Cases in Equity, vol. 2, part 2, pp. 18, 26.

Between the date of the contract and the tender of the deed, or offer of complainant to comply, there was no material alteration in the situation of the parties or the value of the property. *Bellas* v. *Hays*, 5 S. & R. 427.

The covenants to make a deed, and to pay the hand-money, were mutual. If the respondent wished to be off from the contract, he was bound to tender performance and demand compliance, and on failure of the complainant to comply, to declare the contract rescinded. But the respondent did not offer to perform on his part on the 1st of October, 1851. *Remington* v. *Irwin*, 2 Harris, 143; *Gest* v. *Humphrey*, 5 Vesey, 818.

The complainant renewed the tender of the deed in June, 1852. The only lien against the property, viz: the residue of Prince's mortgage, was not removed until about that time. The respondent excused or waived an earlier tender by declaring that he would not take the property while it was encumbered; and the Prince mortgage did not mature until April 1, 1852, and was not actually satisfied on the record until June following. And the respondent having made no objection to the tender, as regards time, but placed it on other grounds, he will be considered as having waived it. *Smith* v. *Barnum*, 2 Anstr. 527; *Paine* v. *Meller*, 6 Vesey, 349.

2. Was the existence of the Prince mortgage a good objection to completing this contract, on the part of the respondent?

The mortgage was originally for about $1400, but the respondent had notice that it was all paid except the last instalment, for about $327, which came due on the 1st of April, 1852, and was then paid, but not satisfied until the following June; and Finley

proposed to Aiken that he should retain as much of the hand-money as would pay the balance of the mortgage, or to give him good security against it—both of which propositions he declined. John Holmes says that he offered to go into a bond with Finley, for a large sum, to protect Aiken against this mortgage. It also appears from the testimony, that the mortgage was the first lien on property of John Holmes, worth about $1000, which would have to be exhausted before resort could be had to the property sold to Aiken. A vendee is not obliged to advance money to pay liens; but when the purchase-money is due and unpaid, he must discharge them. The existence of liens under such circumstances is no reason for withholding the payment of the purchase-money. *Harper* v. *Jeffries*, 5 Wharton, 26; *Noble* v. *M'Ginnis*, 7 W. & S. 154; 3 H. 447.

3. Deficiencies in the quantities of ground.

Respondent has all the ground called for in the written contract; but he alleges, in his answer, that complainant represented to him, before and at the time of making the contract, that a certain brick wall, and the ground on which it stood, were embraced within his limits and belonged to him.

When there is a failure of title to part, and the part lost is not essential to the residue, the court will allow the contract to be enforced, with deduction from the purchase-money for the loss. *Stoddart* v. *Smith*, 5 Binn. 355, 363; *Fulweiler* v. *Bauer*, 15 S. & R. 45.

Fraud is an exception; and when that exists, the contract is dissolved. Courts of equity decree compensation or damages where the claim is incidental to other relief. 2 Story's Equity, 104; Leading Cases in Equity, vol. 2, part 2, pp. 20, 34, 35, 36; *Lehr* v. *Beaver*, 8 W. & S. 106; *Biddle* v. *Moore*, 3 Barr, 161; *Aycinena* v. *Peries*, 6 W. & S. 243; *Neel* v. *Neel*, 7 H. 323.

The opinion of the court was delivered April 5, 1855, by

LOWRIE, J.—The first question here is, may specific performance be decreed under our law of a contract for the sale of land, at the suit of the vendor against the vendée?

The law which is supposed to give this remedy has existed for nearly twenty years, and the courts and the profession have, during all that time, received and acted upon it as being, without doubt, intended to give it. 1 W. & S. 554; 15 State R. 429; 21 Ib. 50; Brightly's R. 135; 1 Parsons, 37, 422.

If we have been in error in this, then all such decrees made in the Common Pleas of Philadelphia, and in original cases in this court, were without authority; for in all those instances, unlike those in the District Court of Allegheny county, the jurisdiction depends upon the legitimacy of the form of the suit, and not upon its subject-matter.

The legislature has not regarded this practice as erroneous; otherwise they would have corrected us, in passing the Act of 1845, P. L. 158, when they were providing for appeals in equity cases, including expressly decrees for specific performance of such contracts. Or they would have corrrected us in some of the numerous acts by which the remedy intended by the original law has been extended to many places to which it did not originally apply.

It is not at all a strange form of remedy, for it exists in the Orphans' Court as a means of enforcing such contracts, and no other is allowed if one of the contractors be dead.   19 State R. 485.   It is well known in England, and in most of the States of the Union, and is therefore among our most familiar ideas.   And besides, in its substance, it is just like very many other actions, for it is intended to make persons perform the very thing they have contracted or are bound to do; and does not allow them to elect to violate their duties, and run the risk of the damages which the other party may recover.

We have attempted in some instances to reach the same object by modifications of our action of covenant, but the. result has constrained us often to acknowledge that the substitute is bungling and inadequate, and that the equity remedy is better, and ought to be encouraged.   10 State R. 273, 279, 280; 11 Id. 387; 12 Id. 56; 13 Id. 282.

Hence it seems to follow very naturally that some new legislation should be had on this subject; and it does not seem unreasonable to suppose that it would be influenced, if not guided, by the light shed upon the subject by the experience of other States, with whose practice the profession is familiar.   To this practice the law does expressly refer, when it gives to our courts the jurisdiction and powers of a court of chancery; for no such court was in existence here.   And it is as clearly referred to in all the specifications of power granted, for they all relate to matters of well-known chancery jurisdiction elsewhere, and many of them to matters which had long ago been imported into our law.   It refers us, for the general form of practice, to that of the Supreme Court of the United States, which, like that of the State courts, in all its main features, is copied from the English courts. In form and substance, therefore, the statute refers us to the practice of our neighbors for a complete understanding of the scope and action of our own legislation; and certainly it is not wrong to learn from the experience of others in matters wherein we are ourselves without experience.

The clause which is especially relevant here, affords "specific relief when a recovery in damages would be an inadequate remedy;" and it is not disputed that the action of covenant, which is the appropriate common law remedy in such cases, gives

[Finley v. Aiken.]

only damages, and does not enforce performance.   11 S. & R. 244; Platt on Cov. 448, 513, 543, 546.   When, therefore, we notice, in addition, that in the usual equity language, the term "specific relief" is a generic term, including "specific performance" as one of its species, we have nothing left to decide, except that a recovery in damages is not in equity regarded as an adequate remedy for a breach of contract for the sale of land.

Now nothing is better settled than that a recovery in damages is regarded as an inadequate remedy in cases where they are estimable only by conjecture, and not by any accurate standard, and this is one of the very grounds on which the remedy by injunction is based.   3 Railw. C. 106, 345; 4 Id. 186; 1 Sim. & S. 607; 3 Atk. 21; 6 Johns. Ch. 501; 16 Pick. 525; 3 Whart. 513.   See also the late case of *The Commonwealth* v. *The Pitts. & Conn. R. R. Co.*   And this consideration, enforced by the morality of the requisition that men shall perform their contracts if they can, and by the immorality of sanctioning their violation of them on their payment of damages, is one of the very grounds on which equity decrees specific performance, and it is a sufficient one.   This reason applies to the duty of both vendor and vendee; for damages for a breach of contract for the sale of land can have no standard, except that which arises from a comparison between the real value of the land sold and the contract price, and everybody knows how conjectural and uncertain are all the estimates of the value of land by different persons; and how very uncertain, therefore, is the only standard on which a recovery in damages can be based.

It seems to us, therefore, that our practice heretofore has not been wrong; that specific performance is one of the forms of "specific relief" intended by the statute; that the test of inadequacy of damages reveals clearly its equitable character; and that, finding ourselves referred by the statute to the chancery practice elsewhere for our guide, and seeing that everywhere else the equity remedy is allowed in such a case as this, we are not justified in excepting it out of our law.   The objection is not so strong with us as elsewhere, that equity cases are tried without the aid of a jury; for all our courts have juries, and may order issues on disputed points of fact, and ought to do so if requested, whenever there is any reasonable ground of dispute.

On the merits of this cause, however, I am instructed to say, that a majority of the court is of opinion that there is such evidence of failure of title to a part of the land sold, and of misrepresentation in relation to its true boundaries, as ought to have prevented a decree of specific performance.   We have some difficulty in agreeing on the reasons for this conclusion; and therefore, and because this cause may come before a jury in another form of action, we shall not offer to give any.

[Finley *v.* Aiken.]

Decree.—April 5, 1855.—This cause came on for hearing on an appeal from the decree of the District Court of Allegheny county, and was argued by counsel at September term, 1853, and re-argued at September term, 1854; and now, on mature consideration thereof, it is ordered, adjudged and decreed, that the said decree of the District Court be reversed and set aside, and that the plaintiff's bill be dismissed at his costs; and it is further ordered, that the receiver appointed by the said District Court, *pendente lite*, do account with the plaintiff, under the direction of the said court, for the rents and profits of the land in controversy, which have been or ought to have been received by him, by virtue of his appointment, and the cause is remanded to the said District Court, with directions to carry this decree into execution.

This opinion was adopted by Lewis, C. J., and Justices Lowrie and Woodward, and was, therefore, read and filed as the opinion of the court.

Mr. Justice Black read the following opinion, expressing his own views and those of Mr. Justice Knox.

Black, J.—One who has sold land for a certain price, to be paid in money at fixed periods, brings a bill in equity against the purchaser, and prays a decree of specific performance. Does the equity jurisdiction of our courts cover such a case?

The question is one of some public importance. It was twice argued with great zeal and ability on both sides. It has caused us to trace anxiously and carefully, the lines which separate our equity powers from our common law jurisdiction. In what case may a plaintiff have his rights determined according to the rules which prevail in courts of chancery? and in what other cases may the defendant insist upon a jury trial? Equity always professes to interfere only where the law is incapable of doing justice. It is contended, however, on the one side, that we have the general equity powers of an English Law Chancellor in all cases where *the law of that country* is deficient. On the other hand it is argued, that the common law of Pennsylvania, aided, strengthened and enlarged as it is by the adoption of equity principles, will furnish many remedies which the law administered in Westminster Hall would refuse, and that equity jurisdiction ought to be tested and measured by the shortcomings of *our own law only*, without reference to that of another country.

I may as well confess myself at the outset to be among those who are steadfastly opposed to any extension whatever of chancery powers, except where it is manifestly necessary to prevent a failure of justice. I think it was not an ignorant prejudice, but high political wisdom, which caused our ancestors to refuse a court of chancery any place among their judicial institutions.

[Finley *v.* Aiken.]

The men who founded this Commonwealth, built up her reputation, achieved her liberties, and settled her lands, knew very well the amount of good and evil which such a court had done elsewhere, and upon sound and deliberate judgment they repudiated it as far as they could.   The administration of law, blended and mixed with equity principles, was a happy conception.   It is no "bungling substitute," but a most admirable improvement of both legal and chancery practice.   There never was any natural reason for separating justice from law, or law from justice; and it was emphatically right to break down the artificial wall of partition which certain professional interests had built up between them in the mother country.   Some of the States of this Union, after a full trial of chancery, have imitated our example; others are rapidly preparing to do so, and even English reform has gone far in the same direction.   It is to be fervently hoped that we will not now extinguish the light by which the world has been walking.   The right of trial by jury needs no vindication.   It is necessary (if for nothing else) to check the tendency of the judicial mind to run into metaphysical refinements.   The two elements of a legal tribunal—the learning of the one and the practical common sense of the other—have a most salutary influence upon the judgments which both must concur in pronouncing. No mode of ascertaining truth can be infallible.   But with a jury that scorns all subtle evasions of plain justice, and a judge who frowns upon vulgar prejudices, we come as near the right as any system can come in this world.   To that mode of trial we owe one mighty fact, namely, that wherever it prevails lawyers, with an influence always powerful, and often preponderant, are the steady defenders of rational, regulated, constitutional liberty, instead of being what they are elsewhere, the mere tools of oppression.

I am glad that these sentiments harmonize with the judgment which I think we ought to give in the present case.   But I am not conscious that they have had any undue influence in bringing me to the conclusion which I have reached.   If the General Assembly, in the rightful exercise of its constitutional authority, has seen proper to give us a power, which no citizen should be clothed with, we cannot make the law otherwise, by thinking how it ought to be.   The point before us must be determined by the judicial precedents which apply to it, and by the words of the statute, understood according to the established rules of interpretation.

The Act of 1836, confers upon the courts the power of "affording special *relief*, when a recovery in damages would be an inadequate remedy."   This is all that relates to the subject now in hand.   When a party cannot be compensated in damages, he may go into chancery, not for *remedy*, but for *relief*.   This

[Finley *v.* Aiken.]

implies that he must be suffering something, *from* which he desires to be, and ought to be relieved. What can that be in the case of a party who seeks the benefit of a contract? Certainly not the contract itself; for he does not ask to be relieved from that. The evil which he demands that equity shall cure, is the inability of the law to do him justice. It is not enough, therefore, to show that damages would be inadequate. If there be a complete remedy for him at law in any shape, then equity can give him nothing which, with the smallest propriety, could be called *relief*. This, indeed, is the very ground on which all equity jurisdiction is based. It admits its functions to be extraordinary, and professes to interfere only when justice can be done in no other way. Like the supernatural machinery of a poem, it is never brought in, except to free the plot from entanglements which no other agencies can restore. *Nec deus intersit nisi dignus sit vindice nodus.* To assume jurisdiction in equity of a cause which can as well be determined in an action at law is not to do equity, but to administer law in a form not legal. It would not be giving relief, but simply usurping power. It would contravene the fundamental principle, by which the English chancellors themselves always limited their authority, and turn the justice of the country without reason, out of the proper and accustomed channels in which it was meant by the constitution to be confined. The rule which I have here indicated as the true one, is so universally acknowledged, that it was stamped indelibly on the very form of the proceeding. Every bill for specific performance (this one like the rest) prays for relief, on the express ground that the plaintiff has no remedy at law.

Is the fact true in this case? Assuming every averment of the bill to be correct, and the whole answer to be false, would not an action at law have given the plaintiff full, complete and ample redress? Certainly it would. He asks for nothing but money. The ultimate object of every word in the decree is to put money in his purse. Will it be pretended that a court and jury cannot give him as much money as he ought to have? If justice to either party requires the verdict to be coupled with conditions, has not all experience demonstrated that such conditions can be easily and safely imposed? Cannot a legal tribunal determine how many dollars and cents will compensate a vendor of real estate for any breach of the contract, as easily as it can ascertain the amount due on a promissory note or a book account? The truth is, that this party, so far from being remediless at law, has an unusual variety of remedies by action, all of them cheap, easy, simple, certain, and complete. He may bring suit for the first instalment. Retaining the title in his own hands as a pledge (literally a mortgage) for the balance, he can demand, when it becomes due, either that the land shall be given up to him, or

[Finley *v.* Aiken.]

sold to satisfy him. In case he sees proper to keep the land and sue on the broken covenant for damages merely, he can recover as much as will make him altogether whole. If the purchase-money agreed on was more than the value of the property, or if the price has fallen in the mean time, he can recover the whole difference, together with full compensation for all his expense, disappointment and trouble. In either of these ways he would have the benefit of every equitable principle which a chancellor could administer. He did not come—he could not have come into equity, because the law was defective; for the truth is other-wise.

That these ample remedies in cases like the present, have been furnished by our law courts for more than a century, and that they are still open, is what nobody denies. But the argument is, that in construing the Act of 1836, our own system of jurispru-dence must be totally ignored; we must look to England and see whether the law there, would come short of justice in a similar case. If this proposition had not been seriously (though, as I think, thoughtlessly) assented to by some of the foremost men of the State, I would not hesitate to call it flatly absurd. As it is, we who do not concur in it, owe it the deference of a most respect-ful answer.

A law must be understood, according to the intent of the law-giver. To us, it seems exceedingly improbable, that the legisla-ture of 1836, knew or thought or cared about rules of the English law, which were not then and never had been in force here. It was nothing to them or their constituents, whether a vendor of land on the other side of the Atlantic, had or had not a remedy by the law which prevailed here. It is impossible to conceive how such a thing could have entered into their deliberations. We have never heard of the Pennsylvania Legislature resolving itself into a committee of the whole on the state of the English nation. No such event is recorded on any page of our history, and we do not believe it ever occurred. No doubt the act was meant to give parties relief from the disability to get justice—a disability created by some unbending rule of law. But what law if not our own? If we must go abroad to find the system referred to, I do not know why we should not look for it in one part of the habitable globe as well as another. The statute is as silent about London as it is about St. Petersburgh or Constantinople. If we can take the new jurisdiction merely because the party with a similar case would have no remedy in England, we can also take it on the ground that justice would very probably be denied him in Russia or Turkey. For these and many other reasons, we are clear that the Act of Assembly before us, has no more reference to the Eng-lish law, or to the law of any other foreign state, than it has to the Mahometan religion. It meant to *relieve* from the defects of

VOL. I.—7

our own law, and the *remedy* spoken of is such as our own courts can give.

It is the duty of the courts, in dealing with a statute, to look at the previous condition of the law,—the mischief which the old law did not provide against,—and then to give the statute that construction, and that only, which will prevent the mischief in future. To use the language of the judges in *Heyden's case*, 3 Rep. 7, we must " consider and discern what remedy the Parliament hath resolved and appointed to cure the disease of the Commonwealth." Among all the maxims of interpretation accumulated by the experience and ratified by the approbation of ages, there is none more valuable than this. Lord Coke, 2 Inst. 301, says, it is "the very lock and key to set open the windows of the statute." The plaintiff's case cannot endure the test of this rule for a single moment. He asks us to close our eyes upon the law, as it was at the passage of the Act, and without thinking of the mischief it caused, look away to something else with which we never had, and never can have any concern. We do not properly consider and discern the disease of the Commonwealth, when we apply the appointed remedy to a sound part of the system, which never needed a cure.

An Act of Parliament was once passed for the punishment of persons who should draw blood in the street. The judges held that this did not apply to a surgeon who bled a patient suddenly taken ill in the street; because the object of the law was to prevent fighting with deadly weapons. The absurdity of an opposite construction upon this statute, would have been nothing compared to that of declaring that a Pennsylvania Act of Assembly must be so applied, as to reform the errors and supply the defects of a foreign law.

There is another most wholesome rule, which requires us to give a strict construction to all statutes in derogation of the common law. It is not to be presumed that the legislature *intended to make any innovation upon the common law further than the case absolutely required, unless it be particularly specified and plainly pronounced.* Dwarris on Statutes, 695. This is a specially sound and salutary canon of construction in a republic, where the legislature is supposed to speak the will of the people. Every community adheres with tenacity to the laws and customs with which it has become familiar. The fact that a rule of conduct has been adopted by common consent, and upheld for a long time without legislative constraint, is evidence of popular attachment to it, and at the same time a strong proof of its intrinsic excellence. When it is to be suddenly changed by a statute, it is fit that the alteration should be made in words of which the sense cannot be mistaken. This statute *is* in derogation of the common law—of course I mean the common law of Pennsylvania. Equity and

[Finley *v.* Aiken.]

law, though flowing originally from different sources, run here in a stream completely intermingled, the whole of which is properly called law and *common* law, as contradistinguished from *statute* law.   The people of their own free will adopted the custom of administering equity and law together, and for five generations they have shown no sign of discontent with the union.  If it is now to be dissolved, let us at least have a plain Act of Assembly.   But this act, so far from being plain, has no word in it, to which mortal ingenuity can assign a meaning broad enough for the purpose.

It is a well-established maxim of construction, enunciated in this court many a score of times, that whenever a statute is capable of two constructions, one favoring, and the other infringing upon the right of trial by jury, we are bound to adopt the former and repudiate the latter.   Here is a case, if there ever was one, for the application of this rule.   It is by no means clear that an Act of Assembly granting the power now claimed, would not be void under the constitution.   "Trial by jury," says the Bill of Rights, "shall be as heretofore, and the right thereof remain inviolate."   I do not assert that this provision is violated by a grant of equity power, properly so called ; for the legislature is expressly authorized to do that by sec. 6 of art. V.   But the power asserted for us under this act is not equity power.   Equity is the correction of that wherein the law is deficient.   Here the law is not deficient.   What the plaintiff asks is merely an administration of the law under the name and in the forms of equity.   If the Bill of Rights means any thing at all, it means at least this ; that no legal dispute involving matters of fact shall be tried without a jury by any tribunal, no matter how it may be named. The legislature certainly could not authorize a bill to be filed for slander, and call that equity.   The reason is, that the injured party may have a remedy for slander by action at law ; and the same reason would apply with equal force to make any statute unconstitutional which would by its terms permit a bill to be brought in a case like the present.

It is not possible to see how this argument against the constitutional validity of such a statute can be met, except by the assertion that the constitution as well as the statute has in view not our own system of law, but that of a foreign country.   I hope I have shown that ground to be wholly untenable.   If equity in Pennsylvania means the power of doing justice, when Pennsylvania law fails, as it means in England the power of doing justice where English law fails, and if Pennsylvania law does not fail in this case, then it follows most clearly that it cannot constitutionally be tried without a jury.   Any reasoning which can resist this conclusion, must be strong enough to prove that the legislature has power to send every thing into equity, and abolish the trial by jury altogether.

[Finley *v.* Aiken.]

But it is said that all these considerations must yield to the power of judicial precedents, which have settled the construction of the Act the other way. If the question had been argued, considered and decided, a decent reverence for the authority of our predecessors, and a just regard for the stability of the law might require us not to disturb it, unless a reconsideration on original principles should be demanded by very grave reasons. But there is no such decision nor any decision at all by this court upon the point. There are cases in which it might have been raised, but it was altogether overlooked both by counsel and court. There are also certain *obiter dicta* scattered through our reports, from which it is very manifest that some of the judges hastily adopted the notion, which I have been trying to controvert. We have often had occasion to repeat what every body knows,—that the loose remarks made by judges about matters not before them, are not to be treated as elements of a legal judgment. They are, in truth, but little better than private conversations. The rights of the people are not concluded on any question, until it has been fairly raised, argued, considered and determined under a full sense of judicial responsibility to the public, the profession and the parties. The dicta, however, on this subject, are not all on one side. Mr. Justice Sergeant, less likely, perhaps, that any man that ever sat here, to express an opinion without serious deliberation, distinctly repudiated and exposed, on more than one occasion, the misconception that we had general equity powers. Justices Rogers, Houston, Kennedy, Burnside, Coulter and Chambers seem to have been prudently silent. The premature expression of opinion was confined to Chief Justice Gibson and Mr. Justice Bell. Both of them would have disregarded their own *dicta* in this case, if they had heard it argued as we have, and thought of it as we do. I am as sure of this as I am of their honor and purity.

The opinion of Judge King, in *Dalzell* v. *Crawford*, 1 Parsons, 41, affirms the doctrine of the plaintiff. The ability of that opinion is not denied, and our respect for its author is not one whit diminished by the fact that he never was on this bench. But as a Common Pleas decision, it has no force of authority that can bind us to a conclusion from which our deliberate convictions impel us to dissent.

We are warned that certain decrees made without thought, and without opposition will be void, if we do not affirm this jurisdiction in its whole extent. This argument reduced to plainer language means that we must go wrong in the face of light, because we once wandered in the dark ; that we must blunder forever on purpose, because there was a time when we blundered by accident ; that we must sacrifice the rights of the present defendant, because some other party did not choose to assert his. In other

[Finley v. Aiken.]

words the settlement of the law is a matter of mere chance. Those decrees are not numerous. I know of but one or two that have ever reached this court. They have been generally executed, and what is done in pursuance of them cannot be undone. Besides, I am perfectly satisfied that in any event they cannot be declared void, for reasons so numerous that I will not stop to give them here.

If this decree could be affirmed, it would furnish all the proof necessary, to show that power like this is very dangerous when entrusted even to able and upright judges. No friend of the constitution could desire an ampler vindication of its wisdom in preferring the legal tribunals. The facts of the bill show very plainly, why the plaintiff with a perfect remedy at law, was yet unwilling to trust the common sense and love of plain justice which a jury would have brought to the investigation. Let us look at them.

. The property sold, consisted of two small pieces of ground, in the city of Pittsburgh. The lines of one as described in the agreement are respectively forty-one, fifty, and forty-eight feet; of the other thirty-one, forty-eight, and thirty-one feet. For these pieces of ground the defendant agreed to pay six thousand dollars. The buildings then on them covered nearly the whole of them.

The defendant swears in his answer, that he was grossly imposed upon about the size of the lot; that while he was negotiating for the purchase, the plaintiff showed him a brick wall and a privy, and assured him that both these structures were embraced within the lines of the property sold; whereas, in truth the wall was wholly and the privy was in part upon the lot of the next neighbor. He could not have the ground on which they stood nor the use of either, except by the sufferance of their true owner, who asserted his right, and soon afterwards gave notice that they must come down. The defendant avers on his oath that he executed the written contract under the delusion caused by this misrepresentation of the plaintiff, and otherwise never would have made it. He also proves the fact by a disinterested witness, in whose presence and hearing the plaintiff admitted more than a year afterwards that the wall was included in his sale.

A vendor cannot have a decree for the specific performance of a contract which he has induced the vendee to make by any kind of misrepresentation concerning the subject-matter. This is a proposition which fortunately I am not compelled to couple with an argument. Here at least is plain sailing. There is no *dictum* to oppose this. If equity does take jurisdiction, it will not repudiate this principle, whatever may have been done by Chancellors, Commissioners of the Great Seal and Masters of the Rolls; no one of them—not Bacon in his corruption, nor Jeffreys in his

[Finley *v.* Aiken.]

wrath—not Maynard in his dotage, nor Leach in his hurry—ever said or acted as if he thought that a contract could be enforced in favor of a party who had procured it to be made by means of his own falsehood. All authorities at home and abroad with one voice declare, that he who seeks equity must do equity—that he must come with clean hands; with perfect propriety of conduct, 1 Tac. & W. 172, and with a contract just and fair in all its points. 3 Atk. 385. The conduct of the plaintiff in the transaction must be liable to no imputation whatever. 18 Ves. 10; 14 Id. 518. He cannot demand this extraordinary aid if he has been guilty of misrepresentation in a degree which operated only to a small extent in causing the contract. Ibid. In our own State, even suspicious circumstances were held by Chief Justice Tilghman, a good ground for refusing a decree or a judgment equivalent to a decree. 2 Binney, 129. And "I agree," said Chief Justice Gibson, long afterwards, "that to be enforced in equity, it must have come from an immaculate source. 8 Watts, 374. It is unnecessary to multiply authorities; for all men, learned and unlearned, can see at a glance that it would be revolting injustice to allow a vendor to recover all of the purchase-money without the abatement of one jot, while he is unable or unwilling to make a title for the whole of the thing which he sold or pretended to sell—for all that the vendee thought he was buying. The bargain should be performed fully, fairly and honestly on both sides, or on neither."

Here, then, is a simple principle, to be applied to a simple fact. The plaintiff did misrepresent the subject of the contract, and the rule is that in such a case the contract shall not be enforced.

It is suggested that the Judge of the District Court did not believe the witness. The Judge has not said so. At all events, we have the same means of ascertaining the truth that he had. The case came to him as it comes to us, upon paper. This is not a writ of error, but an appeal, on which we hear the cause *de novo*, re-examine the evidence, and determine it according to our own judgment. There is no room for a doubt about this fact. The witness did not forget. He was told at the time to bear it in mind, and he testified with positive certainty. If his oath is not true, he knew it to be false. His statement is natural and probable in itself, and is not contradicted by a single known fact in the case. He is entirely disinterested. His reputation for truth and veracity has not been impeached or even assailed, and must therefore be taken as being above reproach. Under these circumstances, what right has any judge to blister the character of a witness, by fixing upon it forever the odious imputation of wilful and corrupt perjury? By what authority can he refuse to a party the benefit of evidence regularly produced, coming from a competent source, and true by all the tests which

[Finley *v.* Aiken.]

the wisdom of the law can apply to it? We sit here to judge between men according to the law, and dare not command that any man, whether party or witness, shall be smitten against law. We are governed by rules and principles in weighing evidence, as much as we are in the exercise of other judicial functions. If a judge sitting in equity can shut his eyes on the evidence, and disregard the proofs in a cause whenever he pleases, then no citizen will be secure when we come to have a marble chair and a chancellor's foot in every county of the State. If he can decide against one person who has proved his case, he can decide in favor of another without any proof at all; and so he will be not a judge but an autocrat, making his own capricious will the only voucher of his deeds.

Another argument is, that assuming the testimony of the witness to be true, the conversation referred to ought not to be taken as an admission by the plaintiff that he was guilty of any fraud in making the misrepresentation which he confessed he had made. There is not a spark of evidence to show that he did not know where his lines really were. Neither before nor afterwards did he ever claim or pretend to claim that he was the owner of the wall and privy, or the ground on which they stood. Now, when a man sells that which he knows not to be his, or makes a wilful false statement for his own advantage to another, who acts upon the faith that it is true, what is it, if it be not a fraud?

Supposing, however, (what the evidence does not permit us to suppose,) that this false representation was all a mistake, the plaintiff's argument is not advanced by that concession a single step. No man can profit by his own errors at the expense of another whom he has misled. Where one of two parties, equally innocent, must suffer by a mistake, he who made it must take the consequences. Besides, a misstatement like that here proved, can never be entirely blameless. The plaintiff was bound to know his own lines; he had the means of knowing; and he was inexcusable if he did not know before he undertook to point them out to a purchaser. But if it was a mere mistake at first, it is a fraud now. An honest man, who has fallen into error like this, and so misled his neighbor, will not and cannot, with a clear conscience, insist upon a specific execution. I use the emphatic and clear language of Chief Justice Gibson, in a case very much resembling this, when I say that he who would avail himself of his own misrepresentation, even where it was unintentional, is as much open to an imputation of fraud as if its falsity had been known to him. 2 Barr, 124. In another case, 2 Barr, 105, this court pronounced it to be wholly immaterial whether such a misrepresentation was believed by the party who made it to be true, or known to be false. The undoubted rule, universally acknowledged, always laid down, and never departed from,

is that a false statement by the vendor concerning the subject-matter of the contract, whether made innocently or fraudulently, will totally disable him from getting a decree like this. The vendee is not bound in conscience to pay for what he did not get, and the vendor, if he is honest, will not ask him to do so.

The materiality of the fact misrepresented has been very faintly denied. It ought not to be denied at all in the face of such evidence as there is here. The wall is nine inches thick, and leaves an inch and a half of the adjoining lot, inside of it, making altogether ten and a half inches of ground to be taken off from one side. This would be a trifle out of a large farm. But when we consider the very small size of the lot, and the very large price at which it was sold, it is manifest that ten inches and a half from the whole length of one side would make an important difference, leaving all peculiarities out of view. Moreover, a perfectly reputable witness, well acquainted with it, says, that if this privy is removed, there is no spot on the property where another can be built, except at the front gate next the street. Perhaps it is not easy to tell what a *chancellor* might think of such an ornament as a privy at the street door of a city residence, but any *jury* would be able to understand it as a most serious objection to the property, reducing its value down to a very low figure. The defendant and his counsel, (probably in the hope of compromising this difficulty,) made an effort to buy the ground occupied by the wall and privy from the owner, but he refused to sell at any price, and afterwards testified before the examiner that he would not make a title of it for five hundred dollars. Every thing in the case corroborates the defendant's answer, that he would not have made the purchase if he had known the truth.

It is scarcely worth while to notice that part of the plaintiff's argument, in which he asserts that the articles of agreement cannot be varied by parol evidence. It cannot be necessary, at this time of day, to show by authority, that any writing may be overturned by proof of fraud in its inception, or that a fraud should be considered as very clearly proved, when it is confessed in the market-place.

The plaintiff did not offer a deed within the time limited by the contract of sale, and there were encumbrances on the property which were not cleared off until long afterwards. We forbear any investigation of these matters, because we think the points already noticed are decisive.

Nothing said here is intended to deny or affirm the plaintiff's right to recover on his agreement, in case he chooses to bring an action at law.

There is one other conclusion which it may be proper to exclude. Our opinion, though decidedly hostile to the adoption

[Bell *v.* The Ohio and Penna. R. R. Co.]

of chancery forms in the administration of ordinary legal justice, is by no means opposed to their free and liberal use in cases where there is no other effectual mode of redressing injuries, public and private. It is, for instance, our only means of perpetuating and discovering evidence, and of controlling trustees and corporations.